**Bradley J. DONAHUE, Plaintiff,**

v.

**CITY OF BOSTON, et al., Defendants.**

**No. CIV. A.00–10884–JLT.**

United States District Court, D. Massachusetts.

Dec. 13, 2001.

Michael C. McLaughlin, Boston, MA, for Plaintiff.

Janis M. Berry, Conway T. Dodge, Jr., Brendan P. Mitchell, Rubin & Rudman, Elizabeth J. Day, William V. Hoch, Office of the Legal Advisor Staff Attorney, Rory J. Fitzpatrick, Irene C. Freidel, Andrew C. Glass, Kirkpatrick & Lockart LLP, Edward J. DeAngelo, Attorney General's Office, Sinkel, Attorney General's Office, Boston, MA, for Defendants.

Toni G. Wolfman, Foley, Hoag & Eliot, Nadine Cohen, Lawyers Committe for Civil Rights Under Law of the Boston Bar Association, Boston, MA, for Movants.

*MEMORANDUM*

TAURO, District Judge.

Plaintiff Bradley Donahue ("Donahue") sues the City of Boston, the Boston Police Department ("Department"), and various public officials,[1] alleging that the hiring practices of the Department, governed by the consent decree issued by this court in *Castro v. Beecher*[2] ("consent decree"), are discriminatory under the Fourteenth Amendment to the Constitution, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1981, 1983, 1985 and 1986. The consent decree was entered in 1973 and was to apply to the recruitment procedures of the Massachusetts Civil Service Commission in order to counteract past discrimination.

Defendants have moved for summary judgment, arguing that Donahue does not have standing to bring his claim.

**BACKGROUND**

Because Donahue challenges the hiring procedures of the Department, a detailed description of those procedures is necessary. To become a police officer, a candidate must pass a statewide civil service examination. That examination is administered by the Commonwealth of Massachusetts Human Resources Division (HRD).[3] After it administers the exam, the HRD then compiles an "eligible list," enumerating those people who passed the examination. Those listed are eligible for appointment to a civil service position.[4] The HRD alternates minority and non-minority candidates on the eligible list pursuant to the consent decree.[5] All of the hierarchy considered in the creation of the eligible list is subject to the consent decree's candidate alternation requirements.[6]

The candidates on the eligible list are divided into residents and non-residents of Boston.[7] Residents, regardless of score, are ranked higher than are equally situated non-residents, subject to the alternation requirement of the consent decree. Within the group of residents, some have a statutory preference and are ranked higher than those without a statutory preference. The statutory preferences are: (1) the child of a firefighter or police officer who was killed or sustained injuries that resulted in death; (2) disabled veterans, in order of their respective standing; (3) veterans, in order of their respective standing; (4) widows, or widowed mothers of veterans who were killed in action or died from a service connected disability incurred in wartime service, in order of their respective standing; and (5) all others, in the order of their respective standings.[8] Those candidates with a statutory preference are all ranked higher than are candidates without a statutory preference, subject to the alternation requirement of the consent decree.[9] Candidates without a

---

1. · Other named defendants are Paul F. Evans, Commissioner of the Department; James J. Hartnett, Personnel Administrator of the Commonwealth of Massachusetts Executive Office for Administration and Finance, Human Resources Division; James P. McDonagh, Assistant Personal Administrator of the Human Resources Division; Marc Charvanne, Director of Test Administration of the Human Resources Division; and John Marra, General Counsel of the Human Resources Division.

2. 365 F.Supp. 655 (D.Mass.1973).

3. First Am. Compl. ("Compl.") ¶ 12.

4. *See* Mass. Gen. Laws ch. 31 § 1.

5. Compl. ¶ 73; Callahan Aff. ¶ 8.

6. Callahan Aff. ¶ 13.

7. Callahan Aff. ¶ 9.

8. *See* Mass. Gen. Laws ch. 31 § 26.

9. Callahan Aff. ¶¶ 10, 13.

statutory preference are ranked according to their scores on the civil service examination.[10] In addition, the Civil Service Commission can order that certain candidates be placed at the top of the eligible list, regardless of residence or statutory preference.[11]

In order to hire a new class of student officers, the Department requisitions from the HRD the exact number of positions it wishes to fill.[12] The HRD then certifies sufficient names from the eligible list available for appointment, pursuant to the Mass. Gen. Laws and the Personnel Administrator Rules ("PAR").[13] Starting from the top of the eligible list, and moving down in strict rank order, the Personel Administrator certifies twice the number of persons requested by the Department, plus one (2n +1), creating the certification list.[14] Though the names on the certification list represent the highest names from the eligible list, the lists may not match exactly because the HRD has the option of editing an eligible list based on information about candidates' statutory preferences.[15] The Department conducts background checks on all candidates on the certification list.[16] The Department must select for appointment candidates in order of their position on the certification list provided by the Commonwealth, starting with the highest-ranking person, unless it supplies a reason for bypassing someone.[17] The Department is prohibited from learning the examination scores of any of the candidates.[18]

In addition to the above hiring procedures, the Department can hire new officers in three other ways. It can appoint: (1) police cadets;[19] (2) former members of the Department who retired because of disability and are seeking reinstatement;[20] and (3) former recruit officers from a previous class.[21]

Donahue challenges the procedures followed and the appointments made by the Department as a result of both the April 1997 and May 1999 civil service exams.[22] Donahue maintains that he should have been appointed as a police officer, and he asks this court to issue an order that he be appointed a student officer, retroactive to July 2, 1998, award him damages for his lost wages, overtime, and other benefits, enjoin Defendants from using race in making any future decisions involving him, and award him attorneys' fees.[23]

10. Callahan Aff. ¶ 12.

11. Callahan Aff. ¶ 13. The following codes are found on the eligible list: "534C" and "534V" indicate people receiving an order from the Civil Service Commission placing them at the top of the eligible list regardless of preference or residency; "402A" indicates the child of a firefighter or police officer who, while in the line of duty, was killed or sustained injuries that resulted in death; " * * " indicates a person who is a disabled veteran; " * " indicates a person who is a veteran. *See* Callahan Aff. ¶ 14.

12. Callahan Aff. ¶ 17.

13. *See* Mass. Gen. Laws ch. 31 § 6; Callahan Aff. ¶ 19.

14. PAR § .09; Callahan Aff. ¶ 19.

15. Callahan Aff. ¶ 19.

16. Callahan Aff. ¶ 20.

17. *See* Mass. Gen. Laws ch. 31 § 27.

18. Callahan Aff. ¶ 21.

19. *See* Stat.1984 ch. 277.

20. *See* Mass. Gen. Laws ch. 32 § 8.

21. *See* 550 CMR 3.04(1)(e); Callahan Aff. ¶ 26.

22. *See* Compl.

23. *See* Compl.

## THE APRIL 1997 CIVIL SERVICE EXAM

The HRD administered a statewide civil service examination on April 26, 1997.[24] The HRD then prepared the eligible list from applicants who passed the examination.[25] Donahue passed this exam with a score of 92.[26] Because he passed this exam, Donahue was placed on the eligible list at page 27.[27] From this eligible list, the Commonwealth provided the Department with a general certification list containing the names of the top one hundred and eighty-seven candidates who were eligible for appointment $(2n + 1)$, in addition to three special certification lists of persons who qualified for a hiring preference based on their ability to speak Spanish, Vietnamese, or French–Creole, respectively.[28] On June 10, 1998, the Department appointed eighty-three people to the Boston Police Academy, comprised of: (1) thirty-seven officers from the general certification list; (2) ten from the language certifications; (3) one disability retiree; (4) thirty-one cadets; and (5) four officers who were from a previous Academy class.[29] Of the thirty-seven officers appointed from the general certification list-the only list from which Donahue could have been appointed-all thirty-seven qualified for a statutory preference.[30] The last non-minority hired by the Department was Michael Hanson, a veteran whose name appears on page three of the eligible list.[31]

The Department decided that it was necessary to appoint another class of officers from the eligible list which was created from the results of the April, 1997 exam. Consequently, the HRD issued another certification list.[32] There were one hundred and sixty-three names on that list.[33] Additional certification lists were created with the names of those candidates who had a language preference.[34] On May 12, 1999, the Department appointed fifty-six people to the Boston Police Academy, comprised of: (1) thirty-one officers from the general certification list; (2) four from the language certification lists; (3) one disability retiree; (4) seventeen cadets; and (5) three officers recycled from a previous class.[35] Of the thirty-one officers appointed from the general certification list, eighteen qualified for a statutory preference and thirteen were certified to the list pursuant to the consent decree.[36] Sixty-eight officers were certified to the list as a result of the April 1997 exam and appointed. Fifty-five of them had a statutory preference. Thirteen officers who were appointed had no statutory preference and were appointed as a result of the consent decree.

The lowest-ranking, non-minority applicant who was appointed to the May 1999 class was Michael Want. Mr. Want's name, on page four of the eligible list, is approxi-

24. Compl.¶ 13.

25. Compl. Exhibit A.

26. Compl. ¶¶ 12, 27.

27. Compl. Exhibit A, pg. 27.

28. Compl. Exhibit B; Callahan Aff. ¶ 30 (the Department also requisitioned from the HRD three language certification lists).

29. Callahan Aff ¶ 34.

30. Callahan Aff. ¶ 36.

31. Callahan Aff. ¶ 39; Compl. Ex. A.

32. Callahan Aff. ¶ 42.

33. Callahan Aff. ¶ 42.

34. Callahan Aff. ¶ 42.

35. Callahan Aff. ¶ 46.

36. Callahan Aff. ¶ 48.

mately number 188 on the eligible list.[37] Donahue's name, on page twenty-seven of the eligible list, is approximately number 1350 on the list.[38] There are 1172 names between Want and Donahue on the eligible list. Since the names on the eligible list alternate between minority and non-minority, half of the names on the eligible list are minorities. Thus, there are 586 non-minority names between Want and Donahue on the eligible list. Thirteen people were appointed from the certification list as a result of the consent decree. Eliminating the consent decree altogether, and eliminating minorities from consideration for those thirteen spots, Defendants would have had to consider 586 applicants before they reached Donahue.[39] Typically, the Department hires one person for every three persons listed on an eligible list. The Department, therefore, would have considered thirty-nine candidates to fill the thirteen spots.[40] Defendants argue that these undisputed facts demonstrate that according to this process, Donahue certainly would not have been hired.

## THE MAY 1999 CIVIL SERVICE EXAM

On May 8, 1999, the HRD administered another statewide civil service entrance examination.[41] Donahue passed this examination with a score of 96.[42] The HRD completed the same process described above and, on March 5, 2001, the Department appointed forty-nine new police officers, comprised of thirty-three from the general certification list and sixteen from the cadet program.[43] Twenty-six officers from the general certification list qualified for a statutory preference. Seven were minorities certified to the list pursuant to the consent decree.[44] Without the consent decree, only seven positions would have been available to candidates who, like Donahue, had no statutory preference. The lowest-ranking non-minority applicant who was appointed was Richard McNeil, a veteran whose name appears on page two of the eligible list, at number ninety-one.[45] Donahue's name appears on page seven of the eligible list, at number 326. There are 117 non-minority candidates between McNeill and Donahue who would be considered for the seven spots that were filled pursuant to the consent decree before Donahue would be considered. The Department hires one person for every three persons listed on the eligibility list. To fill these seven spots, they would have considered twenty-one candidates.[46] Based on these undisputed facts, Defendants argue that, even without the consent decree, Donahue would not have been hired. Because of his low score, he was too far down on the eligible list.

The Department did not require another certification list from the May 1999 exam. The hiring of officers based on the results of that exam is complete.[47]

## DISCUSSION

Defendants move for summary judgment, pursuant to Federal Rule of Civil

---

37. Compl. Ex. A.

38. Compl. Ex. A

39. Callahan Aff. ¶ 56.

40. Callahan Aff. ¶ 57.

41. Compl. ¶ 142.

42. Compl. ¶¶ 143, 144.

43. Callahan Aff. ¶ 63.

44. Callahan Aff. ¶ 65.

45. Callahan Aff. Ex. 22.

46. Callahan Aff. ¶ 75

47. Callahan Aff. ¶ 76

Procedure 56. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [48] When a trial court decides a motion for summary judgment, it "examines the entire record in the light most flattering to the nonmovant and indulges all reasonable inferences in that party's favor." [49] Defendants argue that they are entitled to summary judgment, because Donahue does not have standing to bring his claim.

The Constitution limits the jurisdiction of the federal courts to cases or controversies.[50] A plaintiff, therefore, must demonstrate that he has standing to sue in order for his action to proceed in federal court.[51] "The burden of establishing standing rests with the party who invokes federal jurisdiction." [52] "[T]he standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." [53] In *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, the Supreme Court held that:

to satisfy Article III's standing requirements, a plaintiff must show that (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[54]

Moreover, the Supreme Court has made it clear that satisfying the standing inquiry is "an indispensable part of the plaintiff's case, [and] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." [55] When responding to a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice." [56] But, when responding to a motion for summary judgment, the plaintiff "must set forth by affidavit or other evidence, specific facts, which for the purposes of the summary judgment motion will be taken to be true." [57]

At the core of Defendants' standing argument is that Donahue has not established the requisite injury. Defendants point out that Donahue would not have been hired, regardless of the consent decree that he seeks to challenge.

**48.** Fed. R. Civ. Proc. 56(c).

**49.** *Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir.1997) (internal citations and quotations omitted).

**50.** U.S. Const. art. III. § 2, cl. 1.

**51.** *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (where the court discusses the origin of the standing requirement and the elements of standing).

**52.** *Rhode Island Ass'n. of Realtors, Inc. v. Whitehouse,* 199 F.3d 26, 30 (1st Cir.1999).

**53.** *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal quotations omitted).

**54.** 528 U.S. 167, 180–181, 120 S.Ct. 693, 145 L.Ed.2d 610(2000) (citing *Lujan,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

**55.** *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

**56.** *Id* (internal citations and quotations omitted).

**57.** *Id* (internal citations and quotations omitted).

Defendants rely heavily on *Texas v. Lesage*,[58] where a white applicant who had been denied admission into a doctoral program challenged the admissions process under the Fourteenth Amendment and the civil rights statutes. In that case, the Supreme Court said that "even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration."[59] Though that case did not explicitly address the issue of standing, it is instructive on the issue, as recently noted by the Eleventh Circuit:

> [*Lesage*] plainly bears on [the standing inquiry] because it further defines the kind of injury that would support relief in a case challenging the process of awarding benefits under an affirmative action plan. Injury in fact is the touchstone of standing, and it is to Supreme Court decisions such as *Lesage* that we must look in defining the relevant injury in these types of cases.[60]

According to *Lesage*, Donahue's claim may not proceed if Defendants can establish that they would have made the same decision, despite the existence of the consent decree, while hiring based on the April 1997 and May 1999 civil service examinations. The *Wooden* court applied *Lesage* in its standing analysis of several plaintiffs who challenged the admissions process at the University of Georgia.[61] The admissions process there had three stages.[62] Race was a factor at the second step.[63] Applicants, however, could be eliminated from contention at the first step, before consideration of the race factor.[64] The court held that one plaintiff, Davis, who was denied admission at the initial stage of the admissions process, did not have standing because: "[Davis'] position would virtually abolish the injury-in-fact requirement. . . . [A] white applicant knocked out at the first stage of the UGA admissions process based on purely race-neutral criteria-as part of an entirely race-neutral inquiry into objective qualifications-cannot claim to have been denied an opportunity to compete on an "equal footing" with non-white applicants."[65]

Donahue's position is similar to that of plaintiff Davis in *Wooden*. Like the admissions process in *Wooden*, the Civil Service Commission's hiring process is also essentially one of stages. Applicants take the Civil Service exam and receive a score. Then their test score ranking may be effected if they benefit from one of the statutory preferences discussed earlier. These are race neutral factors. If an applicant does not have a statutory preference, his ranking is based solely on his score. The consent decree is then used to create a list which is based on these priorities and which alternates candidates based on race.

Just as was the plaintiff Davis in *Wooden*, Donahue was eliminated from possible appointment before race, i.e. the consent

---

58. 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999).

59. *Id* at 20–21, 120 S.Ct. 467 (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

60. *Wooden v. Board of Regents of the University System of Georgia*, 247 F.3d 1262, 1277 (11th Cir.2001) (internal citations and quotations omitted).

61. *See Id* at 1274–1278.

62. *See Id.* at 1266.

63. *See Id.*

64. *See Id.*

65. *Id.* at 1282–3.

decree, was a factor. The undisputed facts show that Donahue was not included in the certification list because his test score was too low, and he had no statutory preference. As has already been pointed out, Donahue's April 1997 civil service examination score placed him at approximately number 1350 on the eligible list. There were two certification lists prepared from that eligible list. The Department hired 139 officers, 126 of whom had statutory preferences. There were only thirteen hires pursuant to the consent decree. As stated above, independent of the consent decree, the Department would have had to consider 586 applicants ahead of Donahue for thirteen spots. Donahue would not have been hired.

As has also been pointed out, Donahue's May 1999 exam score placed him at approximately number 326 on the eligible list. There were only seven hires pursuant to the consent decree. Even without the consent decree, the Department would have had to consider 117 candidates for those seven spots before it reached Donahue. Again, Donahue would not have been hired.

*Lesage* held that, "[s]imply put, where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, *there is no cognizable injury warranting relief under § 1983.*" [66] This is exactly the situation before this court. The undisputed facts demonstrate that Donahue's test scores and lack of statutory preference doomed his candidacy to failure before the consent decree came into play. Because Donahue has no injury, he has no standing. His claims, therefore, must be dismissed.

**66.** *Lesage,* 528 U.S. at 21, 120 S.Ct. 467 (emphasis added).

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is ALLOWED. AN ORDER WILL ISSUE