# United States Court of Appeals
## For the First Circuit

No. 02-1027

BRADLEY J. DONAHUE,

Plaintiff, Appellant,

v.

CITY OF BOSTON, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Schwarzer,[*] Senior District Judge.

Michael C. McLaughlin, for appellant.
Rory FitzPatrick, with whom Irene C. Freidel, Charles J. Dyer, Kirkpatrick & Lockhart LLP, and William V. Hoch were on brief, for the City of Boston appellees.
William E. Reynolds, Assistant Attorney General, Government Bureau, with whom Thomas F. Reilly, Attorney General, were on brief, for the state appellees.
Toni G. Wolfman, with whom Foley, Hoag & Eliot LLP, Nadine M. Cohen, and Maricia Woodham of the Lawyer's Committee for Civil Rights, were on brief, for appellees The Massachusetts Association of Minority Law Enforcement Officers and the Boston Chapter of the National Association for the Advancement of Colored People, Inc.

September 5, 2002

---

[*]  Of the Northern District of California, sitting by designation.

**TORRUELLA**, **Circuit Judge**.    Appellant Bradley Donahue brought suit in the district court challenging, on equal protection grounds, an affirmative action program for the hiring of Boston police officers.  The program is the product of a consent decree entered in 1973.  See Castro v. Beecher, 365 F. Supp. 655 (D. Mass. 1973).  After concluding that Donahue failed to establish standing to assert his claims, the district court entered judgment adverse to Donahue on all claims.  For the reasons stated below, we affirm in part and reverse in part.

## I.   FACTS AND PROCEDURAL HISTORY

### A.   The selection process

To be eligible for appointment to the Boston Police Academy ("the Academy"), a candidate must take a statewide civil service examination.[1]  The examination is administered by the Commonwealth of Massachusetts Human Resources Division ("HRD").  After HRD administers the exam, it compiles an "eligible list" setting forth those people who received a passing score on the examination (a score of at least seventy is considered passing).  In accordance with the terms of the consent decree, HRD assembles the eligible list by alternating minority and non-minority candidates.  All individuals on the eligible list are considered qualified for appointment to a civil service position.

---

[1]  In accordance with the terms of the consent decree, the civil service exam has been validated under the testing guidelines of the Equal Employment Opportunity Commission, see 29 C.F.R. pt. 1607 (1978).

The candidates on the eligible list are then divided into residents and non-residents of Boston. Residents, regardless of score, are ranked higher than non-residents. Within the group of residents, candidates with so-called "statutory preference" receive an additional boost on the eligible list. The categories of statutory preferences include: (1) the children of firefighters or police officers who were killed or sustained injuries that resulted in death; (2) disabled veterans; (3) veterans; and (4) widows or widowed mothers of veterans who were killed in action or died from a service-connected disability incurred in wartime service. The candidates with a statutory preference are all ranked higher than those without a statutory preference. Candidates without a statutory preference or the requisite language skills are ranked according to their scores on the civil service examination, subject to the alternation requirement of the consent decree.

When the time comes to hire a new class of student officers, the Boston Police Department ("BPD") requisitions a "certification list" from HRD to fill the positions. HRD then certifies sufficient names from the eligible list available for appointment. Starting from the top of the eligible list, and moving down in strict rank order, HRD creates the certification list by certifying roughly twice the number of persons requested by BPD. Subject to background checks on all candidates on the certification list, BPD must select candidates for appointment in order of their position on the list, starting with the highest-ranking person, unless it supplies a reason for bypassing

-3-

someone.  Special certification lists are also created for those candidates who qualify for a hiring preference based on their ability to speak Spanish, Vietnamese, and French-Creole. Typically, BPD hires one person for every three persons listed on the general certification list.

In addition to this hiring procedure, BPD can hire new officers in three other ways.  The first such mechanism is the appointment of police officers from a statutorily-created police cadets program.[2]  Second, former members of BPD who retired because of a disability may seek reinstatement to their former positions. See Mass. Gen. Laws ch. 32, § 8.  And finally, the Massachusetts Criminal Justice Training Council has promulgated regulations that allow an appointing authority to recycle former recruit officers into a subsequent Academy class.  See 550 Code Mass. Regs. § 3.04(1)(e).

## B.  The April 1997 exam

Donahue, a white male, took the statewide civil service examination administered by HRD on April 26, 1997.  He received a passing score of ninety-two and was thus placed on the eligible

---

[2]  The cadet program is authorized by state statute, see 1984 Mass. Acts ch. 277, which permits the Boston Police Department to hire up to 33 percent of its new officers each year from the program, see 1979 Mass. Acts ch. 560.  The program enables the BPD to recruit prospective candidates for entry-level police officer positions from all areas of Boston by employing police cadets to perform administrative duties while obtaining some basic experience and training.  Once a person is a cadet for two years, passes the statewide civil service examination, and successfully completes the same screening procedures used to evaluate applicants from the certification list, that person can be appointed to the Academy.

list. Donahue does not qualify for a statutory preference, nor does he possess the language skills that would place him on a special certification list. Donahue's name appears at page twenty-seven of the eligible list.

In response to BPD's requisition, HRD provided a certification list containing the names of the top 157 candidates who were eligible for appointment. In addition, HRD provided three special certification lists of persons who qualified for a hiring preference based on their ability to speak Spanish, Vietnamese, or French-Creole, respectively. On June 10, 1998, BPD appointed eighty-three people to the Academy, comprised of: (1) thirty-seven officers from the general certification list; (2) ten from the special language certification lists; (3) one disability retiree; (4) thirty-one cadets; and (5) four officers from a previous Academy class. All thirty-seven officers appointed from the general certification list qualified for a statutory preference. The last non-minority hired was a veteran whose name appears on page three of the eligible list.

Later, BPD decided that it was necessary to appoint another class of officers from the same eligible list that was created from the results of the April 1997 exam. In response to BPD's requisition, HRD issued a certification list containing 163 names. Additional special certification lists were created with the names of those candidates with the requisite language skills. On May 12, 1999, BPD appointed fifty-six people to the Academy, comprised of: (1) thirty-one officers from the general

certification list; (2) four from the language certification lists; (3) one disability retiree; (4) seventeen cadets; and (5) three officers recycled from a previous class. Of the thirty-one officers appointed from the general certification list, eighteen had statutory preferences. The thirteen officers without statutory preference, all minority candidates, scored higher on the exam than Donahue.

The lowest-ranking non-minority applicant who was appointed to the May 1999 class was an individual whose name appeared on page four of the eligible list, while Donahue's name appeared on page twenty-seven. Since the names on the eligible list alternate between minority and non-minority, there were more than 580 non-minority names between the lowest-ranking non-minority appointee and Donahue.

## C. The May 1999 Exam

On May 8, 1999, HRD administered another statewide civil service entrance examination. Donahue passed this examination with a score of ninety-six. On March 5, 2001, consistent with the procedure we have already described, BPD appointed forty-nine new police officers, comprised of thirty-three candidates from the general certification list and sixteen from the cadet program. Twenty-six officers appointed from the general certification list qualified for a statutory preference. The seven without statutory preferences were all minority candidates certified to the list pursuant to the alternation requirement of the consent decree.

Although six of these candidates had exam scores greater than Donahue's, one minority appointee had a lower exam score.

The lowest-ranking non-minority applicant appointed was an individual whose name appears on page two of the eligible list, at number ninety-one. Meanwhile, Donahue's name appears on page seven of the eligible list, at number 326. Thus, there were 117 non-minority candidates between the last non-minority appointee and Donahue.

## D. Proceedings in the district court and the April 2001 exam

Donahue filed his complaint on May 10, 2000, asserting claims of discrimination under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1981 and 1983. The complaint names as defendants the City of Boston, the BPD, and the Commissioner of the BPD (collectively, "appellees"). Donahue also asserted claims under 42 U.S.C. §§ 1985 and 1986 against several state officials (collectively, "state appellees") based on their failure to comply with certain public record requests. Donahue's complaint prayed for injunctive, monetary, and declaratory relief.

After filing his complaint, Donahue took the civil service examination again on April 26, 2001, receiving a passing score of 100. BPD requisitioned a certification list in order to hire police officers from the class of individuals that took that exam. In response, HRD forwarded a certification list dated September 14, 2001. Donahue's name does not appear on that certification list. Appellees contend that, because Donahue had reached the age of thirty-two when he took the April 2001 exam, he

was ineligible for appointment to the Academy under a recent state statute which provides that, in any municipality that adopts the statute, no person who has reached his thirty-second birthday on the date of the entrance examination shall be eligible to have his name certified for "original appointment" to a municipal police officer position.[3]    2000 Mass. Acts ch. 242 ("Chapter 242") (codified at Mass. Gen. Laws ch. 31, § 58A).

On May 30, 2001, appellees moved for summary judgment on the ground that Donahue lacks constitutional standing to assert the claims set forth in his complaint.  On September 13, 2001, Donahue cross-moved for summary judgment, claiming that the undisputed facts demonstrate that the consent decree is unconstitutional.  On October 30, 2001, Donahue also moved for leave to amend his first amended complaint to add a claim based on the results of the April 2001 exam and to assert a challenge to the constitutionality of Chapter 242.

---

[3]   The entire text of the statute reads:

> Notwithstanding the provisions of any general or special law to the contrary, in any city, town or district that accepts this section, no person shall be eligible to have his name certified for original appointment to the position of firefighter or police officer if such person has reached his thirty-second birthday on the date of the entrance examination. Any veteran shall be allowed to exceed the maximum age provision of this section by the number of years served on active military duty, but in no case shall said candidate for appointment be credited more than four years of active military duty.

Mass. Gen. Laws ch. 31, § 58A.

In a memorandum and order dated December 13, 2001, the district court granted appellees' motion for summary judgment. Donahue v. City of Boston, 183 F. Supp. 2d 202 (D. Mass. 2001). By orders entered December 14, 2001, the district court denied as moot Donahue's motion for summary judgment and his motion to amend the first amended complaint. Donahue's timely appeal followed.

## II.  ANALYSIS

Donahue makes numerous assertions of error on the part of the district court. Distilled to their essence, however, Donahue's arguments fall into three basic categories. First, Donahue argues that the district court erred in concluding that he lacked standing to assert an equal protection claim seeking both prospective and retrospective relief. Second, he argues that the court below abused its discretion in denying his motion to amend. Finally, he claims error in the district court's entry of judgment on his claims against the state appellees. We address these issues separately.

### A.  Standing

The standing doctrine is grounded in the case-or-controversy requirement of Article III. Allen v. Wright, 468 U.S. 737, 750 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). The "irreducible constitutional minimum

of standing" contains three requirements.[4] <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). First, a plaintiff seeking to invoke a federal court's jurisdiction must show that he has "suffered or is threatened by injury in fact to a cognizable interest." <u>Save Our Heritage, Inc.</u> v. <u>Fed. Aviation Admin.</u>, 269 F.3d 49, 55 (1st Cir. 2001); <u>see also</u> <u>Defenders of Wildlife</u>, 504 U.S. at 560. The asserted injury must be "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." <u>Defenders of Wildlife</u>, 504 U.S. at 560 (citations and internal quotation marks omitted). Second, the plaintiff must show a causal connection between the asserted injury and the challenged action of the defendant; this causal connection cannot be overly attenuated. <u>Id.</u> And third, the plaintiff must show that it is likely -- rather than merely speculative -- that "the injury will be redressed by a favorable decision." <u>Id.</u> at 561.

"[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents." <u>Int'l Primate Prot. League</u> v. <u>Adm'rs of Tulane Educ. Fund</u>, 500 U.S. 72, 77 (1991). That is, "the standing inquiry requires careful judicial examination of . . . whether the particular plaintiff is entitled to an adjudication of the <u>particular claims asserted</u>." <u>Allen</u>, 468 U.S. at 752 (emphasis added). Thus, a plaintiff must ensure that he establishes standing for each claim and for each

_____

[4] Only the constitutional requirements of standing are at issue here; the elements of prudential standing are not implicated by this case. <u>See generally</u> William A. Fletcher, <u>The Structure of Standing</u>, 98 Yale L.J. 221, 251-53 (1988).

-10-

form of relief sought.  See Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 210-11 (1995).

In reaching its determination with respect to standing, the district court did not differentiate between Donahue's claim for retrospective relief in the form of damages and his claim for prospective relief in the form of an injunction and declaratory judgment.  Because we perceive crucial analytical differences between the two claims, we scrutinize them independently of one another.  Our review of the district court's ruling on standing is plenary.  Nyer v. Winterthur Int'l, 290 F.3d 456, 459 (1st Cir. 2002).

### 1.  Damages claim

Donahue argues that he is entitled to pursue his damages claim because he was denied appointment to the BPD under a facially race-conscious hiring policy.  In contrast, appellees argue that Donahue lacks standing to assert his claim for damages because he cannot demonstrate that he would have been hired under race-neutral criteria.  We agree with appellees that Donahue cannot establish standing to claim damages.

The Supreme Court addressed a similar issue in Texas v. Lesage, 528 U.S. 18 (1999) (per curiam).  In Lesage, a white plaintiff brought an equal protection action under 42 U.S.C. § 1983 for monetary damages after unsuccessfully applying to a doctoral program at the University of Texas.  Id. at 19.  Although the university did not dispute that race was a factor considered at some stages of the admissions process, id., the district court

-11-

granted summary judgment to the university, reasoning that the plaintiff would have been denied admission even if race had not been a factor in the admissions process, id. at 20. Reversing the district court, the Fifth Circuit held that the plaintiff's chances under a color-blind admissions scheme were irrelevant if he could prove that his application was treated differently because of race. Id. The Supreme Court then reversed the Fifth Circuit, holding that the government was entitled to summary judgment on the damages claims. The Court stated, "[s]imply put, where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." Id. at 21.

In this case, Donahue's complaint alleged three instances in which he was passed over for appointment to the Academy. The first two instances stemmed from hiring decisions based on the results of the April 1997 exam. On that exam, roughly 580 non-minority applicants scored higher than Donahue but were not considered for appointment. Thus, in order for Donahue to have been appointed based on his April 1997 exam scores under an otherwise race-neutral policy, all of these applicants would have to be considered and rejected. The situation was similar when Donahue was passed over for a third time, based on the results of the May 1999 exam. There, roughly 120 non-minority applicants scored higher than Donahue but were also denied appointment. Under a race-neutral policy, the BPD would have had to consider and

reject all of these candidates before Donahue was offered a position.

It is plain from the undisputed evidence that, notwithstanding the race-conscious elements of the consent decree, Donahue was too far down the list to be even remotely considered for hiring in any of the three instances of which he complains. It follows unavoidably from Lesage that Donahue's damages claim is therefore doomed to fail.[5]

This would ordinarily be the end of our inquiry on this claim. However, the fact that this question comes to us as one framed in terms of Article III standing -- which is, of course, jurisdictional in nature -- adds one significant consideration. That is, this Court must resolve questions pertaining to its subject-matter jurisdiction before it may address the merits of a case. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101-02 (1998); see generally Scott C. Idleman, The Demise of

_____

[5] Donahue attempts to avoid this conclusion by arguing that, since he is the only BPD applicant to have filed a lawsuit and other unsuccessful non-minority applicants have now forfeited their rights, he is essentially the "next in line" for an appointment to the BPD. While this argument demonstrates admirable creativity, it is not persuasive. A litigant cannot use the fact that he filed his lawsuit to bootstrap an argument against potential standing and causation deficiencies in the very same lawsuit.

Donahue also argues at some length that appellees are implementing the terms of the consent decree incorrectly by hiring new officers from the cadet program. It is unclear how this allegation bears on Donahue's claim that he was discriminated against based on his race. To the extent he intimates that the cadet program is being operated based on a racial quota system, he offers little more than speculation as to the program's supposedly discriminatory operation. Nor does he contend that he applied for the cadet program but was denied entrance due to unlawful racial considerations.

Hypothetical Jurisdiction in the Federal Courts, 52 Vand. L. Rev. 235 (1999) (examining the effects of Steel Co.'s prohibition on exercising "hypothetical jurisdiction").  We must therefore determine whether Donahue's inability to establish that he would have received the benefit he sought under a race-neutral policy warrants dismissal based on standing, or, alternatively, whether this deficiency in his case goes only to the ultimate merits of the claim.  We hold that, in this case, dismissal for want of standing was appropriate.

By its own terms, the Court's decision in Lesage does not specifically address standing.  Nevertheless, we read Lesage as clarifying the "injury in fact to a cognizable interest" that is required to support standing for Donahue's damages claim.[6]  Save Our Heritage, 269 F.3d at 55; see also 1 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 2.13, at 29 (2002 Supp.) (suggesting that Lesage is pertinent to evaluating standing for damages claims).  Injury-in-fact is a touchstone of the standing

---

[6]  It is noteworthy that Donahue did not assert a claim of race discrimination under Title VII, which makes it unlawful for an employer to consider race as "a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  An employer who violates this provision may still be held liable for declaratory relief, certain limited injunctive relief, and attorney's fees, even though the employer would have taken the same action in the absence of the impermissible motivating factor. Id. § 2000e-5(g)(2)(B).  Congress is empowered to create substantive rights and to authorize suit for their enforcement.  Consequently, Congress may define an injury, as it did in Title VII, in a way that provides the basis for standing even in the absence of other injury to the plaintiff.  See Defenders of Wildlife, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment).  But as Donahue made no claim under Title VII, we need not consider its implications for his standing to sue.

inquiry, and the Lesage decision states in no uncertain terms that, unless the plaintiff can demonstrate that he would have received the sought-after benefit under race-neutral criteria, "there is no cognizable injury warranting relief under § 1983." 528 U.S. at 21. Without the ability to establish a cognizable injury that would warrant the type of relief sought, a plaintiff cannot demonstrate the requisite injury, the causal link between the injury and the defendant's conduct, or redressability for the injury.

A recent decision from one of our sister circuits underscores the point. In Aiken v. Hackett, 281 F.3d 516 (6th Cir. 2002), petition for cert. filed, 70 U.S.L.W. 3742 (May 20, 2002) (No. 01-1707), the Sixth Circuit addressed an equal protection claim by several white police officers who sought and were denied promotions to the position of sergeant. The promotion system was governed by a consent decree that required a certain number of minority candidates to be promoted. Id. at 518. Although some white officers would have received the promotion in the absence of a racial preference, the Aiken plaintiffs were not among them. As the court stated, it was "beyond debate that . . . [the plaintiffs] still would not have been promoted to sergeant," as it was their "composite [test] scores (not the City's affirmative action program) [that] kept them from being promoted." Id. at 519. Accordingly, the court held that the plaintiffs lacked standing to seek retrospective relief, reasoning as follows:

> If the plaintiffs allege that a racial preference cost them some benefit under a government program, those plaintiffs may have alleged an injury in fact. But if those same

> plaintiffs cannot also allege and show that "under a race-neutral policy" they would have received the benefit, those plaintiffs have not alleged an injury in fact because they have not alleged an invasion of some interest that the law protects.

Id.

At least one circuit, however, has concluded that an equal protection plaintiff who seeks damages in a challenge to an affirmative action plan need not demonstrate, for purposes of standing, that he would have received the sought-after benefit in the absence of considerations of race. See Wooden v. Bd. of Regents of the Univ. Sys. of Ga., 247 F.3d 1262, 1279 (11th Cir. 2001). The Wooden court reasoned that "the injury in these kinds of cases is not the denial of the sought-after benefit, but rather the direct exposure to unequal treatment." Id. at 1280. The court reasoned further that the plaintiff's inability to show that he would have ultimately obtained the benefit under race-neutral criteria under Lesage "goes less to standing than it does to [his] ability to succeed on the merits of his claim." Id.

Our analysis hews closer to Aiken than Wooden. We think that Lesage is a clear cue from the Supreme Court that we cannot apply identical standing analyses to claims for damages and claims for prospective relief. It is equally apparent, in light of Lesage, that the "equal footing" analysis is applied only in claims for the former type of relief.[7] Our standing inquiry on the claim

---

[7] Although a plaintiff might be able to demonstrate that he was prevented from competing on equal footing, it is unclear how such a plaintiff would satisfy the element of redressability necessary to assert a claim for damages. Lesage plainly dictates that

-16-

for damages therefore asks whether Donahue can demonstrate that, under a race-neutral policy, he would have received the benefit for which he now seeks compensation.

To be sure, cases will arise where, because the issues of causation and injury are disputed and fact-intensive, the plaintiff's inability to demonstrate damages should be treated as a merit-based question. See, e.g., Mt. Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977) (holding that, even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can defeat liability by proving as an affirmative defense that it would have made the same decision absent the forbidden consideration). But in Donahue's case, his inability to qualify for hiring on race-neutral grounds is so overwhelmingly established that any claim to the contrary would be "wholly insubstantial and frivolous." Bell v. Hood, 327 U.S. 678, 682-83 (1946). Where the absence of causation and a relevant injury-in-fact are presented with such clarity, dismissal for lack of subject-matter is justified. See Steel Co., 523 U.S. at 89 (holding that dismissal for lack of subject-matter jurisdiction is proper when "the claim is 'so insubstantial, implausible, foreclosed by prior decisions . . . , or otherwise completely devoid of merit as not to involve a federal controversy.'") (quoting Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 666 (1974)); accord Verizon Md., Inc. v. Pub. Serv.

damages may only be awarded based on a showing that the plaintiff would have received the benefit absent the unlawful discrimination.

-17-

Comm'n, 122 S. Ct. 1753, 1759 (2002); Owasso Indep. Sch. Dist. No. I-011 v. Falvo, 122 S. Ct. 934, 938 (2002). We therefore affirm the ruling of the district court with respect to Donahue's claim for damages.

## 2. Claim for prospective relief

As we have already noted, standing to assert an equal protection claim for prospective relief is viewed through a different prism. The crucial difference between claims for damages and claims for prospective relief was summarized by the Lesage Court in this manner:

> [A] plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered. The relevant injury in such cases is "the inability to compete on an equal footing."

528 U.S. at 21 (quoting Northeastern Fla. Chapter of Assoc. Gen. Contractors v. Jacksonville, 508 U.S. 656, 666 (1993)); accord Adarand, 515 U.S. at 211; Richmond v. J. A. Croson Co., 488 U.S. 469, 493 (1989) (plurality opinion). In other words, a plaintiff may establish standing for prospective relief if he has or is likely to be "expos[ed] to unequal treatment." Wooden, 247 F.3d at 1279. However, because the relief sought is forward-looking, the plaintiff must also be able to show that he is "able and ready" to apply for the benefit and that the challenged "discriminatory policy prevents [him] from doing so." Jacksonville, 508 U.S. at 666; see also O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a

-18-

present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").

Notwithstanding the appellees' various arguments to the contrary, we think it is plain that Donahue was denied the opportunity to compete on equal footing in the BPD's hiring process on account of his race.  It is not disputed that at least one minority candidate -- one with no statutory preference or language skills -- was appointed to the Academy despite having scored lower than Donahue on the May 1999 exam.  Such evidence makes the conclusion inescapable: Donahue would likely have been hired based on his May 1999 exam score if he were a minority applicant.  Although this is not the same as evidence demonstrating that Donahue would have received an appointment under race-neutral criteria, it is enough to satisfy a key element of standing to seek forward-looking relief.

Appellees assert, however, that Donahue lacks standing for his prospective-relief claims for the additional reason that he is not "able and ready" to apply for future appointment to the BPD. They note that Chapter 242 prevents individuals, such as Donahue, who are over the age of thirty-two from applying for a position in the police or fire department of any city that adopts the law.  See Mass. Gen. Laws ch. 31, § 58A.  Since Donahue can no longer apply to be a Boston police officer, appellees argue, he would not be subject to a future violation of his right to compete for the job on equal footing with all other applicants, regardless of race.

Donahue responds by arguing first that Chapter 242, by its own terms, does not apply to him. The statute states that those aged thirty-two or older are not eligible for an "original appointment." Id. Donahue contends that, because he has worked as a police officer in another city (Yarmouth, Massachusetts), his appointment to a position in the BPD would not be "original" within the meaning of the statute. Appellees dispute Donahue's interpretation of Chapter 242 and argue that an "original appointment" is the appointment of any person who has not been previously appointed to the same position (i.e., a Boston police officer).

Donahue argues further that, while Boston initially accepted Chapter 242, it has since repealed it. Appellees assert that this is simply not so. But, unfortunately, the record does not disclose what action, if any, the Boston City Council has taken with respect to Chapter 242.

Because it is a relatively new statute, we find no Massachusetts cases that give a definitive interpretation of the reach of Chapter 242. And it is difficult to determine on the record and briefs before us whether the statute would pose an obstacle to Donahue's standing to seek prospective relief. As a general matter, "original appointment" appears to be a term of art in the state civil service statutes that denotes any position that is filled from an eligible list established as the result of a competitive civil service examination. See Mass. Gen. Laws ch. 31, § 6; see generally City of Somerville v. Somerville Mun. Employees

Ass'n, 481 N.E.2d 1176, 1180-81 (Mass. App. Ct. 1985) (noting the differences between "original" and "promotional" appointments under the Massachusetts civil service laws). Such a definition appears to have been applied to an earlier statute, since repealed, that is analogous to Chapter 242. See Joseph v. Adm'r of the Div. of Pers. Admin., 416 N.E.2d 990, 991-92 (Mass. App. Ct. 1981) (rescript opinion).

While these considerations would seem to point in favor of appellees' interpretation of Chapter 242, the answer is not pellucid. The parties have not provided us with the factual and legal support for a reasoned conclusion, particularly in regards to the question of whether Chapter 242 continues to be observed by the City of Boston.[8] In all events, Donahue's standing to pursue prospective relief in the form of an injunction against the operation of the consent decree requires greater development. We therefore reverse the district court's ruling insofar as it applies to Donahue's prospective-relief claims.

## B. Motion to amend

Donahue sought to add a handful of claims to his complaint by way of a motion to amend, which the district court denied as moot following the entry of judgment on all of Donahue's claims. We review the district court's denial of Donahue's motion

---

[8] Donahue's claim that the Boston City Council has rescinded its approval of Chapter 242 is one that we expect will be backed with evidentiary support. Cf. Fed. R. Civ. 11(b)(3).

-21-

for an abuse of discretion.  Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995).

First, Donahue attempted to augment his complaint with a claim for damages and injunctive relief based on his failure to be hired in light of his performance on the April 2001 civil service exam.  As we have already discussed, Donahue scored 100 on the exam but was not considered for employment because of Chapter 242.  Appellees argue that, because Donahue was ineligible to seek future appointment to the BPD based on his age, the addition of any claim based on the April 2001 test results would be futile.  Donahue argues that the amendment would not be futile because the terms of Chapter 242 do not apply to him and because the Boston City Council rescinded Chapter 242.

This leads to the second amendment Donahue sought to include in his complaint: a claim that Chapter 242 is unconstitutional because its age restriction does not pass scrutiny under the Equal Protection Clause of the Fourteenth Amendment.  See Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 83 (2000) ("States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest.").  Appellees argue that such an amendment would be futile because age is not a constitutionally protected class and, as a consequence, similar restrictions for police officers have been upheld by other courts.  See Thomas v. U.S. Postal Inspection Serv., 647 F.2d 1035 (10th Cir. 1981) (upholding an age limit of thirty-four for hiring postal

inspectors); <u>Arritt</u> v. <u>Grisell</u>, 567 F.2d 1267 (4th Cir. 1977) (upholding an age limit of thirty-five for hiring new police officers); <u>Sobieralski</u> v. <u>City of South Bend</u>, 479 N.E.2d 98 (Ind. Ct. App. 1985) (same); <u>Figueroa</u> v. <u>Bronstein</u>, 344 N.E.2d 402 (N.Y. 1976) (per curiam) (same with regard to an age limit of thirty-two); <u>Ridaught</u> v. <u>Div. of Fla. Hwy. Patrol</u>, 314 So. 2d 140 (Fla. 1975) (same with regard to an age limit of thirty-five); <u>cf.</u> <u>Mass. Bd. of Ret.</u> v. <u>Murgia</u>, 427 U.S. 307 (1976) (holding that a Massachusetts statute mandating the retirement of uniformed police officers at age fifty survives rational-basis scrutiny).

Because we remand part of Donahue's case for further consideration, we view the motion to amend as no longer moot. However, there may be other reasons, well within the district court's discretion, for denying Donahue's motion. Thus, we leave it to the district court upon remand to determine in the first instance whether Donahue's proposed amendments are appropriate.

## C. Claims against state appellees

Finally, Donahue complains that the district court erred in granting summary judgment on his remaining claims. The gravamen of these claims is that the state defendants violated 42 U.S.C. §§ 1985 and 1986 by withholding certain documents (including copies of the original consent decree) from Donahue in a manner inconsistent with the Massachusetts Public Records Law, Mass. Gen. Laws ch. 66, § 10. The district court's order does not mention these claims, nor is it apparent that the court even considered the claims before entering judgment on the entire case. Nonetheless,

-23-

we may affirm the district court's judgment on any ground squarely presented below.  Pure Distribs., Inc. v. Baker, 285 F.3d 150, 156 (1st Cir. 2002).

As an initial matter, Donahue makes only the most half-hearted attempt to challenge the entry of judgment.  Donahue's main brief devotes only three sentences to the issue, arguing in essence that the absence of a reason given by the district court for entering judgment alone warrants reversal.  Our general rule with regard to such poorly developed arguments is to treat them as forfeited.  See Beatty v. Michael Bus. Mach. Corp., 172 F.3d 117, 120-21 n.2 (1st Cir. 1999); Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998).

Moreover, Donahue has not adduced the sort of evidence that would support a claim under 42 U.S.C. §§ 1985(3) and 1986.[9] A claim under § 1985(3) requires the plaintiff to show that (1) some class-based animus (usually racial) lay behind the conspirators' action, and (2) that the conspiracy was aimed at interfering with protected rights.  See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-68 (1993).  In this case, Donahue

[9] Section 1985 has three subsections, each of which sets forth a distinct cause of action.  However, Donahue makes no effort to specify the subsection under which his claim arises.  We think the first two subsections are plainly inapplicable: § 1985(1) protects federal officers from those conspiring to prevent (by force, intimidation, or threat) the officer from discharging his or her duties; and § 1985(2) protects parties and witnesses in federal court from conspiracies to deter them from appearing or testifying. Section 1985(3) is broader in its reach and prohibits, in general terms, conspiracies to violate civil rights.  We therefore assume, for the sake of argument, that Donahue intends to assert a claim under §§ 1985(3) and 1986 (the latter extends liability to persons who knowingly fail to prevent conspiracies under the former).

points to no evidence -- direct or indirect -- of class-based animus. Instead, Donahue's claim appears to be nothing more than a thinly disguised attempt to repackage a state-law public records action as a claim arising under federal law. We therefore affirm the district court's entry of judgment in favor of the state appellees.

## III. CONCLUSION

For the reasons stated above, we reverse the district court's judgment with respect to Donahue's claim under the Equal Protection Clause for prospective equitable relief. Because the case remains active, the district court should also reevaluate the propriety of Donahue's motion to amend. In all other respects, the district court's judgment is affirmed. We remand the case for further proceedings consistent with this opinion.

**Affirmed in part, reversed in part, and remanded**.