RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0311P (6th Cir.)
File Name: 01a0311p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LEE YEAGER,
     *Plaintiff-Appellant,*

     *v.*

GENERAL MOTORS
CORPORATION,
     *Defendant-Appellee.*

No. 00-3026

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 98-02478—Peter C. Economus, District Judge.

Argued: January 30, 2001

Decided and Filed: September 7, 2001

Before: NORRIS, SILER, and BRIGHT, Circuit Judges.[*]

---

**COUNSEL**

**ARGUED:** Michael D. Rossi, GUARNIERI & SECREST, Warren, Ohio, for Appellant. Robert S. Walker, JONES, DAY, REAVIS & POGUE, Cleveland, Ohio, for Appellee.

---

[*] The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1

**ON BRIEF:** Michael D. Rossi, GUARNIERI & SECREST, Warren, Ohio, for Appellant. Robert S. Walker, JONES, DAY, REAVIS & POGUE, Cleveland, Ohio, for Appellee.

---

## OPINION

---

BRIGHT, Circuit Judge. When Lee Yeager ("Yeager") was not selected for General Motors Corporation's ("GMC's") apprentice program he sued, alleging that GMC discriminated against him on the basis of his race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and the Fifth Amendment of the United States Constitution. The district court[1] granted summary judgment in favor of GMC.

On appeal, Yeager argues that the district court erred when it determined that he lacked standing to make his Title VII race and sex discrimination claims against GMC and that GMC did not violate Yeager's equal protection rights under the Fifth Amendment's Due Process Clause because GMC's apprentice program did not arise under color of law. For the reasons discussed below, we **AFFIRM**.

## I. JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. Yeager's notice of appeal was timely filed.

## II.  BACKGROUND

GMC recruits applicants into its skilled trade positions (e.g., Truck Repair, Tool Making) through its apprentice training program ("apprentice program"). GMC administers

---

[1] The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio.

its apprentice program in compliance with its collective bargaining agreement with the International Union UAW ("UAW").

GMC seeks apprentice applicants by publishing notices with information about the program and the application process. White males interested in the apprentice program must submit applications. GMC accepts a limited number of applications each hiring period on a first-come, first-serve basis. GMC sends completed applications to an independent firm that randomly selects a specified number of applicants who are then permitted to take a written examination. In addition, GMC seeks qualified minority and female applicants to the apprentice program through its contacts with local minority and female employment organizations. Each applicant lists the top three skilled trades for which they want to be considered.

White male applicants that are randomly selected take a written exam that evaluates their general abilities in areas such as mathematics and reading comprehension. Recruited minority applicants and female applicants are permitted to take the written examination without being randomly selected. If an applicant has previously taken an exam at another GMC plant, and is randomly selected, the applicant may have their previous test score transferred.

Applicants are ranked by their written exam score. The top thirty percent of minority applicants, female applicants, and white male applicants are interviewed. Applicants receive another score for their interview performance.

Applicants receive an overall ranking for each skilled trade based on the sum of their written test and interview scores. The highest possible score is seventy-two. Apprenticeship selections are based solely on the applicants' total scores.

GMC keeps separate lists for seniority applicants and nonseniority applicants pursuant to the terms of its collective bargaining agreement with the UAW. Thus, for every two

seniority applicants offered apprenticeships, only one nonseniority applicant may be offered an apprenticeship.

Applicants' ranked positions on the seniority and nonseniority lists may change in the following three ways: (1) as new applicants are tested and added to the list; (2) as applicants are selected for apprenticeships and taken off the list; and (3) when applicants are allowed to retest and the overall rankings are readjusted. The initial overall rankings for each skilled trade are generated without regard to race or sex. However, minority and female applicants may attempt to increase their total scores by participating in GMC's Pre-Apprentice Training Program ("training program") and the overall rankings are adjusted accordingly.

GMC conducts a training program for minority and female applicants whose scores are near the selection range. The training program provides additional training to minority and female apprentice program candidates. Following their training, minority and female applicants may take a written test that may improve their total score by up to seven points. However, the training program participants may not receive a total score exceeding the maximum possible score of seventy-two. The training program's participants' test points are added to their total scores, and the overall rankings are adjusted accordingly.

Yeager is a nonseniority white male. He applied to the apprentice program at GMC's Lordstown Assembly Plant in 1989. He took his first written exam in 1989 and was interviewed in 1990 for his selected three positions (Truck Repair, Tool Making, and Pipefitting). He attained his highest score, fifty-three, in Truck Repair. In 1991, four seniority positions and one nonseniority position in Truck Repair became available. The nonseniority position was filled by a white male with a score of sixty-eight, fifteen points higher than Yeager's score. In 1993, a new apprentice class was selected, but only two seniority and no nonseniority positions opened in Truck Repair.

Two federal district courts have considered this question and both held that a voluntary contractual relationship between a private corporation and the federal government does not make the private corporation an actor under color of federal law. In *McLaughlin v. Great Lakes Dredge & Dock Co.*, 495 F. Supp. 857 (N.D. Ohio 1980), the court determined that the defendant's implementation of an affirmative action program in compliance with Executive Order No. 11246 was voluntary and not federal action. Likewise, in *Kipp v. LTV Aerospace & Def.*, 838 F. Supp. 289, 292 (N.D. Texas 1993), the court determined that a private party's implementation of a drug-testing program in compliance with its contractual relationship with the government was voluntary and not federal action.

In this case, GMC did not act under color of federal law. GMC voluntarily entered into its contract with the federal government, and its apprentice program was its own creation. GMC designed, implemented, and has always administered its apprenticeship program independently from the government. In addition, we note that Yeager cited no legal authority supporting his argument that GMC acted under color of federal law when it voluntarily implemented its apprentice program. Therefore, GMC did not act as an instrument of the federal government in administering its apprentice program and the Fifth Amendment does not apply to the conduct of GMC in this case.

## IV. CONCLUSION

The district court did not err when it granted summary judgment in favor of GMC on Yeager's Title VII and Fifth Amendment claims. Therefore, we **AFFIRM** the district court's grants of summary judgment in favor of GMC.

Process Clause gives rise to *Bivens* employment discrimination action). A *Bivens* action is a judicially created damages remedy designed to vindicate violations of constitutional rights by federal actors. 403 U.S. at 395-97. In *Vector Research, Inc. v. Howard & Howard Attorneys P.C.*, 76 F.3d 692, 698-99 (6th Cir. 1996), this court held that private actors who cause constitutional injuries can be held liable for damages under *Bivens*, if their conduct is so related to the federal government that they can be regarded as federal agents or actors, that is, that the private corporation acted under color of federal law. *See also Hammons v. Norfolk S. Corp.*, 156 F.3d 701, 707 (6th Cir. 1998). Therefore, GMC's liability depends on whether GMC acted under color of federal law when it implemented its apprentice program.

GMC implemented its apprentice program as part of a Conciliation Agreement with the Equal Employment Opportunity Commission. The Agreement terminated by its own terms in 1988, before any of the events relating to Yeager's complaint occurred. Pursuant to Executive Order No. 11246, which requires government contractors to have affirmative action programs, GMC continued its apprentice program in compliance with the United States Department of Labor's Office of Federal Contract Compliance Programs. Executive Order No. 11246, 3 C.F.R. 339 (1964-1965), *reprinted as amended in* 42 U.S.C. § 2000e note. The apprentice program is also registered with the Department of Labor's Bureau of Apprentice Training. Yeager argues that GMC's compliance with these government programs as part of its contractual relationship with the government establishes that GMC was acting under color of law, and, therefore, GMC should be considered a federal actor subject to Fifth Amendment constraints.

The district court determined that GMC's voluntary compliance with government regulations as part of its contractual relationship with the government did not support a finding of action under federal law. We agree.

In 1996, Yeager exercised his option to retake the written exam and changed his Truck Repair preference to Millwright. After his interviews, Yeager achieved a total score of sixty in Millwright, fifty-seven in Tool Making, and fifty-five in Pipefitting. Later that year, GMC selected apprentices for its Assembly Plant. Thirteen seniority and six nonseniority Millwright apprenticeships became available. Six seniority and three nonseniority Pipefitting apprenticeships became available. Three seniority and one nonseniority Tool Making apprenticeships became available. Yeager's total score placed him fourteenth among the nonseniority white males for Millwright, twenty-fourth for Pipefitting, and thirty-sixth for Tool Making. The top fifty candidates for the apprentice positions were all white males and Yeager was not among them. After the training program points were factored into the overall rankings, thirty-eight white males were accepted into the apprentice program. Women and minorities who had scores lower than Yeager's before they participated in the training program were selected for the apprenticeship program.

In 1997, Yeager applied to the apprentice program at GMC's Lordstown Fabrication Plant. The Fabrication Plant is a separate facility from the Assembly Plant and it has its own, separate, apprentice program. Applicants with a previous score at another GMC facility may have their total score applied to the Fabrication Plant apprentice program but they must first go through the random selection process. Yeager was not randomly selected for the nonseniority applicant list and, therefore, his scores were not transferred.

Yeager filed a complaint against GMC alleging violations of Title VII and the Fifth Amendment in relation to the administration of the apprentice program at the Assembly Plant. Later, he filed an amended complaint making Title VII and Fifth Amendment claims in relation to the administration of the apprentice program at the Fabrication Plant. The district court first granted GMC's motion for partial summary judgment on Yeager's Title VII claims in relation to the Assembly Plant and on Yeager's Fifth Amendment claims in

relation to both Plants. Then, the district court granted GMC's motion for summary judgment in relation to Yeager's Title VII claims regarding the Fabrication Plant. Yeager filed a timely notice of appeal. On appeal, Yeager argues that he has standing to raise his Title VII claims and GMC's apprentice program constitutes action under color of law and, therefore, GMC should be susceptible to his Fifth Amendment claims.

## III. DISCUSSION

We review the district court's grant of summary judgment de novo. *Taylor v. Mich. Dept. of Corr.*, 69 F.3d 76, 79 (6th Cir. 1995). We view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment is proper if the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A.

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. art. III, § 2. The cases-or-controversies requirement has the following three elements: (1) an injury in fact, (2) a causal relationship between the challenged conduct and the injury, and (3) a likelihood that the injury will be redressed by a favorable decision. *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993). To show an injury in fact "in the context of affirmative action programs, the challenger need only show that, but for the program, he would have been considered for the job . . . ." *Brunet v. City of Columbus*, 1 F.3d 390, 397 (6th Cir. 1993).

Yeager argues that he satisfied the injury in fact requirement for his Title VII claims regarding GMC's Assembly Plant because he suffered three distinct injuries. First, Yeager argues he has been injured because training

was not randomly selected to be included on the Fabrication Plant nonseniority applicant list. Minority and female candidates are not subjected to the random selection process. Yeager argues that his scores would have been transferred to the Fabrication Plant except for his race and sex, and that if his scores had been transferred, he would have been selected as a Millwright apprentice.

Whether Yeager's scores would have been transferred but for his race and sex is inapposite. The relevant question for the purpose of assessing standing is whether Yeager would have been hired as an apprentice if he had been randomly selected.

Yeager lacks standing because he would not have been selected as a Millwright apprentice even if his scores had been transferred to the Fabrication Plant. Yeager achieved a written examination score of thirty-three. Even if we assume, for the sake of argument, that Yeager would have achieved the maximum interview score of twenty-seven, his total score would have been sixty. In 1997, GMC hired two nonseniority white male Millwright apprentices and both had scores of sixty-four. Even if Yeager's scores had been transferred to the Fabrication Plant he would not have been selected for a Millwright apprenticeship because the two nonseniority white males hired by GMC possessed superior qualifications (i.e., higher scores). Thus, Yeager lacks standing because he suffered no injury in fact. Therefore, the district court did not err when it granted summary judgment in favor of GMC on Yeager's Title VII claims regarding the Fabrication Plant.

### D.

Finally, Yeager argues that GMC's refusal to hire him into its apprentice program violated his equal protection rights under the Fifth Amendment's Due Process Clause. Although Yeager's complaint does not say so, we assume that he is alleging his Fifth Amendment claim under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). *See also Davis v. Passman*, 442 U.S. 228, 235 (1979) (holding that equal protection component of the Fifth Amendment's Due

court in its motion for summary judgment and Yeager had a chance to respond. Therefore, we can consider whether Yeager has established a prima facie case of reverse discrimination.

A prima facie case of reverse discrimination is established upon a showing that "'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority' . . . and upon a showing that the employer treated differently employees who were similarly situated but not members of the protected group." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (quoting *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)). GMC maintains there is no evidence supporting an inference that it discriminates against white men in the administration of its apprentice program. We agree.

There is no evidence that GMC is the unusual employer that discriminates against the majority. The apprentice program's overall rankings reveal that twenty-three of the top twenty-five nonseniority candidates for Millwright were white men, twenty-eight of the top thirty nonseniority candidates for Pipefitting were white men, and twenty-four of the top twenty-five nonseniority candidates for Tool Making were white men. In fact, eighty percent of the apprenticeships in Yeager's selected trades were awarded to white men. Therefore, the district court did not err when it granted summary judgment in favor of GMC on Yeager's Title VII claims concerning the Assembly Plant because there is no evidence that GMC discriminates against white men in the administration of its apprentice program.

## C.

The district court determined that Yeager lacked standing to raise his Title VII claims concerning GMC's 1997 apprentice program at its Fabrication Plant. Yeager argues that he has standing because he satisfied Article III's injury in fact requirement. The record shows that Yeager was never a viable apprentice program candidate because his application

program points awarded to minority and female apprentice candidates will adversely affect his future ranking. To demonstrate an injury in fact a plaintiff "must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983) (internal quotations omitted).

The district court determined that Yeager's potential future injury was too speculative to satisfy Article III's standing requirements. We agree. Any possible injury to Yeager's future ranking is not imminent. GMC may terminate its training program at any time. Future nonseniority apprentice applicants may achieve higher unadjusted scores than Yeager's and prevent him from becoming an apprentice regardless of the training program. Therefore, Yeager's claim of potential future injury is too speculative to grant him standing.

Second, Yeager argues that he was injured because he did not receive an apprenticeship in 1996.[2] To satisfy Article III's cases-or-controversies requirement there must be a causal relationship between the challenged conduct and the injury. *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. at 663-64.

The district court determined that, regardless of the training program, Yeager would not have received an apprenticeship in 1996 and, therefore, that no causal connection existed between GMC's training program and Yeager's alleged injury. We agree. Yeager was not injured within the meaning of Article III because GMC hired fifty apprentices in 1996 and

---

[2] In his brief, Yeager argued that he suffered injury in 1991, 1993, and 1996. However, Yeager conceded at oral argument that he lacks standing for his 1991 and 1993 claims. Therefore, we address solely Yeager's 1996 claim.

fifty candidates with higher unadjusted scores outranked Yeager. Thus, GMC's training program did not prevent Yeager from obtaining an apprenticeship. Therefore, there is no causal connection between GMC's training program and Yeager's alleged injury of failing to receive an apprenticeship.

Third, Yeager argues that he suffered an injury in fact because he was not allowed to participate in the training program in 1996. In support of his standing argument, Yeager relies upon *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978). In *Bakke* a white male applicant claimed the medical school's special admissions program violated the Fourteenth Amendment's Equal Protection Clause because sixteen of one hundred seats were reserved for disadvantaged minority students. The Court addressed Article III's standing requirements before it reached the merits of Bakke's Equal Protection claim. The Court determined that it was not necessary for Bakke to show that he would have been admitted without the reservation of seats, because standing may be established if the plaintiff is not given the opportunity to compete for all of the available slots. *Id.* at 281 n.14. Yeager insists that he has standing to challenge his exclusion from GMC's training program under *Bakke*'s injury in fact analysis because no white males may participate in GMC's training program.

The district court distinguished *Bakke* on the basis that the 1996 training program was not an educational program. The court determined that the 1996 training program merely afforded minorities and females the opportunity to earn up to seven extra total points. The district court concluded that Yeager failed to show he was excluded from a program that he was entitled to because the training program was not an educational program. However, regardless of whether the district court's attempt to distinguish *Bakke* succeeds, Yeager lacks standing under Article III's cases-or-controversies requirement.

Our Article III standing analysis focuses on whether Yeager has shown that, but for the training program, he would have

been hired for an apprenticeship. *See Brunet v. City of Columbus*, 1 F.3d at 397 (holding that to have standing "in the context of affirmative action programs, the challenger need only show that, but for the program, he would have been considered for the job . . . ."). Yeager's exclusion from the training program is relevant for this case only as it relates to GMC's failure to hire him as an apprentice. The record shows that Yeager alleged in his complaint that GMC violated Title VII and the Fifth Amendment when it refused to hire him into its apprentice program. Yeager's complaint seeks injunctive relief eliminating the training program precisely because Yeager's complaint is predicated on the assumption that, but for the training program, he would have been hired for an apprenticeship. GMC's failure to accept Yeager into the training program does not constitute an injury in fact because it is not causally related to his alleged injury in this case—his exclusion from the apprentice program. We have already determined that, regardless of the training program, Yeager would not have received an apprenticeship in 1996 and, therefore, he was not injured within the meaning of Article III because there is no causal connection between GMC's training program and Yeager's alleged injury.

**B.**

However, even if we assume, for the sake of argument, that Yeager had standing to bring a Title VII action concerning GMC's Assembly Plant apprentice program, such action would not stand on the merits because Yeager cannot establish a prima facie case of reverse discrimination. We recognize that the district court did not reach this issue. However, this court can affirm a grant of summary judgment on a ground presented to the district court if the opposing party had a chance to respond. *Fox v. Van Oosterum*, 176 F.3d 342, 352-53 (6th Cir. 1999) (citing *Herm v. Stafford*, 663 F.2d 669, 684, n.21 (6th Cir. 1981) ("An appellate court can find an alternative basis for concluding that a party is entitled to summary judgment . . . provided it proceeds carefully so the opposing party is not denied an opportunity to respond to the new theory.")). GMC presented this issue to the district