# United States Court of Appeals
## For the First Circuit

Nos. 02-1404
     02-1458
     02-1459

WINIFRED COTTER, ET AL.,

Appellants/Cross-Appellees,

v.

THE CITY OF BOSTON; DENNIS A. WHITE; HAROLD WHITE;
MASSACHUSETTS ASSOCIATION OF MINORITY LAW
ENFORCEMENT OFFICERS,

Appellees/Cross-Appellants,

COMMONWEALTH OF MASSACHUSETTS, Executive Office for
Administration and Finance Human Resources Division, et al.,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before

Boudin, Chief Judge,
Farris,* Senior Circuit Judge,
and Torruella, Circuit Judge.

Michael C. McLaughlin, for appellants.
Rory FitzPatrick, with whom Irene C. Freidel, Andrew C. Glass,
Kirkpatrick & Lockhart, LLP, William V. Hoch, Office of the Legal
Advisor, Boston Police Department, were on brief, for appellee The
City of Boston.

---

* Of the Ninth Circuit, sitting by designation.

Rheba Rutkowski, with whom Jonathan M. Albano, Bingham McCutchen LLP, and Nadine M. Cohen, Lawyers Committee for Civil Rights Under Law of the Boston Bar Association, were on brief, for appellees Dennis A. White, Harold White and Massachusetts Association of Minority Law Enforcement Officers.

---

March 25, 2003

---

**TORRUELLA**, **Circuit Judge**.  Plaintiffs-appellants, seven Caucasian officers of the Boston Police Department ("BPD" or the "Department"),[1] allege that their constitutional rights to equal protection were violated when the Department promoted three African-American police officers to sergeant instead of the appellants, who had the same ranking on the list of officers eligible for promotion.[2]  The district court found that the race-conscious action of the City was narrowly tailored to the compelling state interests of remedying past discrimination and avoiding litigation, and therefore, passed strict scrutiny.  Cotter v. City of Boston, 193 F. Supp. 2d 323, 357 (D. Mass. 2002).  The district court also retained jurisdiction to consider future racially motivated decisions by the Department.  Id. at 356-57.  Appellants appeal the district court's decision, and the City cross-appeals on the issues of standing and retained jurisdiction.  First, we find that appellants have standing to seek immediate

---

[1]  The officers are Winifred N. Cotter, Vincent J. DiFazio, John P. Doris, William J. Dwan, William G. Knecht, Patrick L. Murphy, and Thomas L. Sexton.

[2]  Plaintiffs originally filed suit against the City of Boston and James J. Hartnett, Jr., in his official capacity as Personnel Administrator of the Commonwealth of Massachusetts Human Resources Division.  Hartnett settled with plaintiffs and was dropped from the suit.  We permitted the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO"), and Dennis A. White and Harold White, two of the African-American officers who were promoted to sergeant, to intervene as defendants.  Cotter v. Mass. Ass'n of Minority Law Enforcement Officers, 219 F.3d 31, 37 (1st Cir. 2000).  Except where their interests diverge, we refer to all defendants-appellees collectively as the "City."

promotion only.  Next, we affirm the district court's decision that the City's action was constitutional, finding that the City has demonstrated the compelling state interest of remedying past discrimination.  Finally, we reverse the district court's retention of jurisdiction.

## I.  Background

**A.  Facts**

In December, 1997, the BPD sought to promote thirty police officers to sergeant.  A score was computed for each candidate who took a 1996 sergeant promotion examination given by the Human Resources Division ("HRD").  The score was based on a state examination, a Boston examination, education, and training.  Following standard hiring procedure, the Department obtained a list ranking the top sixty-nine performers.

If promotions had been made in strict rank order, twenty-nine non-African-American officers and one African-American officer would have been promoted, all of whom had a score of eighty-five or higher.  The Department determined that this promotional decision would violate the "four-fifths rule" in the EEOC's Uniform Guidelines on Employee Selection Procedures, indicating possible adverse impact on minority candidates.[3]  See 29 C.F.R. § 1607.4(D)

---

[3]  The four-fifths rule provides that

> [a] selection rate for any race . . . which is less than four-fifths (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the

(2003).  Such adverse impact may signify that the testing or past hiring was discriminatory.  For this reason, and others that we will discuss below, the BPD sought greater African-American representation among sergeants.  Therefore, the Department promoted the top twenty-six officers in strict rank order; this included all officers scoring eighty-six and above, with the exception of one officer who was bypassed for cause.  Seven non-African-American officers had scored eighty-five; two of them were promoted.  Finally, the Department promoted the three African-American officers who had scored 84 (the "African-American Officers"), while choosing not to promote ten Caucasion officers who also scored eighty-four.

Because it had elected to promote officers scoring eighty-four before officers scoring eighty-five, the BPD was required by Massachusetts law to provide a statement to the HRD explaining the reasons for its departure from strict rank order.  See Mass. Gen. Laws ch. 31, § 27 (2002).  The BPD sent a letter to

Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4(D).  Had the BPD promoted in strict rank order, the selection rate for African-Americans would have been three percent (one African-American officer selected out of thirty-three who passed the examination) and the selection rate for non-African-Americans would have been fifteen percent (twenty-nine promoted out of 192 who passed the examination), for a selection ratio of twenty percent (three percent divided by fifteen percent).  This result is well below the eighty percent guideline established by the EEOC.

-5-

the HRD stating that the departure from strict rank order to promote the African-American Officers was done to "ensure compliance with current EEOC guidelines, and applicable federal and state discrimination laws." The HRD rejected this explanation, contending that the BPD was erroneously acting under a terminated consent decree.[4]

In response to the HRD's rejection, the Department promoted six additional officers (one formerly bypassed for cause and five with a score of eighty-five). Thus, the end result was that all thirty-three officers scoring eighty-five and higher were promoted, the three African-American Officers scoring eighty-four were promoted, and ten non-African-American officers scoring eighty-four, including the seven Caucasian plaintiffs, were not promoted. Of the thirty-six officers promoted to sergeant, four were African-American and thirty-two were not African-American.

## B. History of the Case

On May 21, 1999, plaintiffs filed suit against the City alleging that the Department violated plaintiffs' civil rights under 42 U.S.C § 1983 (2003) by failing to promote plaintiffs to sergeant because of their race.

After full discovery, the City moved for summary judgment, alleging that the plaintiffs lacked standing, and that

---

[4] A consent decree governing sergeant promotions at the BPD was allowed to lapse in 1995.

the promotions of the African-American Officers were a narrowly-tailored means of meeting several compelling governmental interests. Specifically, the City claimed that the promotions furthered compelling governmental interests by (a) remedying past discrimination in the Department's promotions of minority officers to sergeant; (b) avoiding the reasonable likelihood of Title VII litigation if the Department made strict rank order promotions; and (c) meeting the Department's operational needs.

On March 22, 2002, the district court dismissed plaintiffs' claims and entered judgment in favor of the City. The district court found that the City's actions were a narrowly-tailored means of remedying the continuing effects of past discrimination and avoiding litigation. See Cotter, 193 F. Supp. 2d at 350. The district court retained jurisdiction post-judgment to oversee all of the Department's future hiring and promotional decisions involving race. Id. at 356-57. This appeal and cross-appeal timely followed.

## II. Discussion

Summary judgment is appropriate upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2003). We review the district court's entry of summary judgment de novo, in the light most favorable to the losing party. Houlton Citizen's Coalition v. Town of Houlton, 175 F.3d

178, 184 (1st Cir. 1999).  We may affirm the district court's decision on "any independent ground that is apparent in the record." United States v. Puerto Rico, 287 F.3d 212, 218 (1st Cir. 2002).

## A.  Standing

Article III of the Constitution confines the federal courts to deciding actual cases or controversies. Allen v. Wright, 468 U.S. 737, 750 (1984).  Inherent in this limitation is the notion that "federal courts may exercise power only as a last resort, and as a necessity, and only when adjudication is consistent with a system of separated powers and the dispute is one traditionally thought to be capable of resolution through the judicial process." Id. at 752 (internal quotations and citations omitted).  The most important Article III doctrine is that of standing, which ensures that plaintiffs have alleged a personal stake in the outcome of the controversy.  Requiring a plaintiff to have standing sharpens the presentation of issues and illuminates difficult constitutional questions. Baker v. Carr, 369 U.S. 186, 204 (1962).

At an irreducible constitutional minimum, a party attempting to invoke federal jurisdiction must establish that (1) he has suffered an injury in fact, (2) the injury was caused by the challenged action of the defendant, and (3) a favorable ruling would likely redress his injury. Lujan v. Defenders of Wildlife,

504 U.S. 555, 560-61 (1992). The standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Allen v. Wright, 468 U.S. at 752. We review the district court's standing decision de novo. Donahue v. City of Boston, 304 F.3d 110, 116 (1st Cir. 2002).

The plaintiffs sue under 42 U.S.C. § 1983, seeking damages, immediate promotion, and an order prohibiting the Department from considering race in future promotions. Since a plaintiff must establish standing for each type of relief sought, id. at 116, we consider appellants' standing to seek damages and injunctive relief separately.[5]

The appellants first argue that they have standing to obtain damages. Prior precedent bars this effort. In Texas v. Lesage, 528 U.S. 18 (1999), the Supreme Court held that "where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." Id. at 21. It is uncontested that had the Department not used race-conscious criteria, it would have only promoted candidates with a score of

---

[5]   The district court decision preceded our decision in Donahue, and the court found that plaintiffs had standing to pursue damages and injunctive relief. Cotter, 193 F. Supp. 2d at 337.

eighty-five or higher.  Because appellants only scored eighty-four, they cannot show standing for damages.

Lesage could be distinguished on the ground that the plaintiff in that case received a lower score than all of the applicants who were admitted to the university program at issue there.  By contrast, the appellants here earned the same score as the African-American Officers.  However, this court in Donahue v. City of Boston, 304 F.3d at 114, read Lesage to encompass a situation similar to this one.  In Donahue, the plaintiff police candidate had received a higher score on the relevant exam than did a minority officer who was hired.  We applied Lesage, noting that the plaintiff had no chance of being hired regardless of the Department's affirmative action program.  Id. at 119.  This interpretation of Lesage controls here as law of the circuit. Several of our sister circuits have also found that plaintiffs lack standing to sue for damages if they cannot show that they would have benefitted had the government not considered race.  See Aiken v. Hackett, 281 F.3d 516 (6th Cir.), cert. denied sub nom. Ashton v. City of Memphis, 2002 U.S. LEXIS 5550 (Oct. 7, 2002); McNamara v. City of Chicago, 138 F.3d 1219, 1221 (7th Cir.), cert. denied, 525 U.S. 981 (1998) ("A plaintiff who would have been no better off had the defendant refrained from the unlawful acts of which the plaintiff is complaining does not have standing under Article III of the Constitution to challenge those acts in a suit in federal

court."); <u>Grahek</u> v. <u>City of St. Paul</u>, 84 F.3d 296, 298 (8th Cir. 1996) (finding Caucasian male candidates for police officer positions lacked standing because they could not show that they would have been promoted, even if the police department had not made use of a list of "protected class applicants").

Appellants next argue that they have standing to seek immediate promotion. While one could imagine that this issue could similarly be resolved against the appellants under <u>Donahue</u> and <u>Lesage</u>, neither of those cases addressed standing for this type of immediate injunctive relief. Instead, both of those cases focused only on standing to seek an injunction to prevent future violations. Thus, neither of those cases, nor any other binding precedent, mandates a certain result here.

Two of the appellants have been promoted to sergeant since this lawsuit was filed, and therefore lack standing to seek immediate promotion. We think that the remaining appellants have made a colorable claim of standing to seek immediate promotion. The Department has promoted African-American officers who obtained the same score as the appellants and there is no indication that the Department would consider demoting the promoted African-American Officers. If we assume <u>arguendo</u> that the Equal Protection Clause prohibits racial discrimination on these facts and permits the injunctive relief sought by the appellants, then it is

sufficiently clear that the appellants would have suffered a cognizable injury for standing purposes.

There is a different form of injunctive relief not explicitly mentioned in the plaintiffs' complaint but arguably embraced by their briefs, namely, that if unlawful discrimination occurred in this case, such discrimination should be barred in future promotion contests involving these plaintiffs. A plaintiff challenging an ongoing race-conscious program satisfies the injury requirement if he shows (1) a likelihood that he will compete for the governmental benefit in question in the future, and (2) that he will be prevented from competing on equal footing because of the government's discriminatory practice. Donahue, 304 F.3d at 119; accord N.E. Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 666 (1993). The difficulty here is that the circumstances are so peculiar that it is at least debatable whether a likelihood of recurrence is sufficient to justify standing on a future repetition theory. See, e.g., Yeager v. Gen. Motors Corp., 265 F.3d 389, 395 (6th Cir. 2001) (finding plaintiff's possible future injury too speculative to grant him standing). Since on the merits we find that there was no unlawful discrimination, the question of whether there would be standing for this form of relief need not be resolved here.

**B.  Affirmative Actions and Strict Scrutiny**

There is rich public debate about the issue of affirmative action.  Some argue it is racial discrimination and is inconsistent with a color-blind constitution, while others believe that it is necessary to put long-oppressed groups on equal footing with the majority.  Our job is not to endorse one view over the other, but to simply evaluate the constitutionality of any racially-motivated governmental program.

The Equal Protection Clause of the Fourteenth Amendment provides, in part, that "no State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.  The Clause does not mandate that every citizen be treated identically, rather, it requires an adequate explanation for treating groups differently.  Race-based distinctions are inherently suspect and are therefore subject to the most searching examination.  Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273 (1986).  The BPD's racially-based promotional decision must withstand strict scrutiny -- the government must show that the classification is narrowly

tailored to further a compelling governmental interest.[6]  <u>Adarand Constructors, Inc.</u> v. <u>Pena</u>, 515 U.S. 200, 227 (1995).

Whether each proffered reason satisfies strict scrutiny is a question of law or a question of how the law applies to the facts; therefore, our review is plenary.  <u>Wessmann</u> v. <u>Gittens</u>, 160 F.3d 790, 795 (1st Cir. 1998).

In order to be a "compelling interest," the government must show that the alleged objective was its actual purpose for the discriminatory classification and must have a "strong basis in evidence to support that justification before it implements the classification."  <u>Shaw</u> v. <u>Hunt</u>, 577 U.S. 899, 908 n.4 (1996). Appellants argue that the Department only presented one justification for its decision to the HRD, and is therefore barred from asserting any other motivations.  We disagree.  Commissioner Evans testified that there were several reasons for his decision to depart from strict rank order in awarding promotions, including remedying past discrimination, avoiding lawsuits, and the operational needs of the Department.  It is plausible that the

---

[6]  The district court stated that "the burden of persuasion rests upon the Plaintiffs to show that the promotion decisions were unconstitutional." <u>Cotter</u>, 193 F. Supp. 2d at 338 (citing <u>Wygant</u>, 476 U.S. at 277-78 (O'Connor, J., concurring)).  While it is true that the ultimate burden of proof in a civil trial lies with the plaintiffs, the Supreme Court has made clear that the government has a burden of production to justify a racial preference. <u>See</u> <u>Adarand</u>, 515 U.S. at 224; <u>cf.</u> <u>United States</u> v. <u>Virginia</u>, 518 U.S. 515, 533 (1996) (placing the burden on the state to justify a gender classification).

Department did not feel the need to identify the multiple factors influencing its decision. If any of the justifications is a compelling state interest, and the City's actions were narrowly tailored to that end, the City's actions are constitutional.[7]

## C. Remedying Past Discrimination

The City asserts that the race-conscious action was necessary to ameliorate "vestiges" of past discrimination by the Department against African-American applicants and officers. The remedying of past discrimination is a compelling state interest, so long as there is a "strong basis in evidence for the conclusion that the [government action] serves a remedial purpose with respect to past discrimination." Stuart v. Roache, 951 F.2d 446, 450 (1st Cir. 1991) (citation omitted); Boston Police Superior Officers Federation v. City of Boston, 147 F.3d 13, 20 (1st Cir. 1998) (hereinafter "Boston Superior Officers"). There must be evidence of discrimination specific to the governmental agency seeking to use racial preference; "societal" discrimination, on its own, will not support affirmative action. Wygant, 476 U.S. at 276. "[W]hether past discrimination necessitates current action is a

---

[7] Appellants also argue that the government is prohibited from asserting alternative "compelling interests" because if one interest fails it demonstrates that the action taken by the government cannot be narrowly tailored, and the entire action therefore fails. We disagree with this argument. A governmental actor may have several reasons for racially-motivated action; if any legitimate reason satisfies strict scrutiny, the action is constitutional.

fact-sensitive inquiry." Wessmann, 160 F.3d at 802. The "strong basis in evidence" may consist of "either a contemporaneous or antecedent finding of past discrimination by a court or other competent body, or evidence approaching a prima facie case of a constitutional or statutory violation." Boston Superior Officers, 147 F.3d at 20 (citation omitted).

The Department's history of discrimination is well-documented by past litigation and records. We outlined the history of past discrimination at the Department a few years ago in Boston Superior Officers, where we found:

> In 1972, we affirmed a district court's finding that the BPD discriminated against black applicants through the use of entry-level testing procedures that favored whites. . . . [T]hat discrimination resulted in a gross racial disparity among the BPD's ranks . . . .
> [Nineteen years later we found] . . . that racial discrimination in entry-level hiring had adversely affected blacks' representation at the rank of sergeant. "Remedial action takes time," we reasoned, "and discrimination may linger for many years in an organization that had excluded blacks from its ranks."

Boston Superior Officers, 147 F.3d at 20 (quoting Stuart, 951 F.2d at 452). In his deposition, Commissioner Evans also expressed the concern that remedying past discrimination takes time.[8] The

---

[8] Commissioner Evans stated:

> When I came on the Department there [were] very small numbers of minority officers, and I think there [were] none in my class of 66, and pretty much my class and classes before me are running the organization right now,

-16-

Department has been working for many years to address racial disparity and bias within its ranks. In 1965, only two percent of police officers in the City were not Caucasian, and only one minority held a position of sergeant or above. In 1978, only five-and-a-half percent of officers were African-American, and only three officers held a position of sergeant or above. While the numbers are more representative today, we are not prepared to rule that all effects of past discrimination have been eliminated. See Boston Superior Officers, 147 F.3d at 23 ("Given the BPD's halting and, at time, quite modest progress in remedying its earlier discrimination, we are reluctant to infer that the vestiges of that discrimination had substantially disappeared when the BPD [made the affirmative action promotion at issue.]").

At the time of the promotions at issue here, the disparity between the number of African-American officers eligible for promotion and the number of non-African-American officers eligible for promotion was statistically significant. One explanation for this discrepancy is the fact that the rankings were based, in part, on experience. Because of the well-documented history of discrimination within the Department, fewer African-

. . . and I think it takes a while within any organization, that there has to be role models and other people in position so that other people will move up and I think it takes a while for that type of historic discrimination that was found in Castro v. Beecher to work itself out. It doesn't happen overnight.

-17-

Americans are in position to be promoted to sergeant. See United States v. Paradise, 480 U.S. 149, 168 (1987) ("Discrimination at the entry level necessarily precluded blacks from competing for promotions, and resulted in a departmental hierarchy dominated exclusively by nonminorities.").

The Department was faced with facts that its efforts at remedying past discrimination had not been successful. A public employer has the requisite firm basis for believing that remedial action is necessary if there is a statistical disparity between the racial composition of the workforce and the relevant, qualified employment pool. Wygant, 476 U.S. at 292 (O'Connor, J., concurring); see also Wessmann, 160 F.3d at 803 ("The greater the disparity [between the number of qualified minority applicants with those who gain entrance], the stronger the inference that discrimination is the cause of non-entry.").

In October, 1996 (the latest date before the African-American Officers were promoted for which data is available), African-Americans comprised 25.02% of the BPD's 1,547 officers, but only 16.49% of the BPD's sergeants. This difference is statistically significant, and not reasonably attributed to chance. This disparity is not just a simple assurance of good intention from the City, but concrete evidence that discrimination existed at the time the African-American Officers were promoted.

In addition, as noted above, had the Department promoted in strict rank order, the selection rate for African-Americans would have been only three percent, while the selection rate for Caucasians would have been fifteen percent. This would have yielded a selection ratio of twenty percent, well below the eighty percent guideline established by the EEOC, and therefore suggested adverse impact on minorities. While not "conclusive evidence of discrimination," this discrepancy in selection rate does serve as a "'benchmark against which . . . to gauge [the City's] efforts to remedy past discrimination.'" Boston Superior Officers, 147 F.3d at 21 (quoting Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 478 (1986) (plurality opinion)). In this case, the selection ratio would have been only twenty percent, indicating that the City had not yet remedied past discrimination.

Commissioner Evans, who made the decision to promote the African-American Officers, was aware of racial tensions within the Department. Officers had complained to him about disparate treatment, including racially-based punishment and job assignment. Officers had also complained to him that they felt racially targeted following an incident where a noose was placed on an officer's motorcycle.

The City's evidence of disparity in the promotion of officers to sergeant, current racial tensions within the Department, and the documented history of past discrimination

-19-

within the BPD created the strong basis in evidence required for the Department to conclude that race-conscious action was necessary. Past discrimination in the hiring of minorities has limited the opportunity for minorities to move up through the ranks, and recent statistics show that these effects remain. We hold that the City has therefore demonstrated that it acted in response to a compelling state interest -- that of remedying past discrimination. See Majeske v. City of Chicago, 218 F.3d 816, 823 (7th Cir. 2000), cert. denied, 531 U.S. 1079 (2001) (holding that statistical evidence of disparity within a police department coupled with anecdotal evidence of discrimination sufficiently establishes a compelling state interest that justifies an affirmative action plan). At this point in time, we find that the City has presented sufficient evidence that past discrimination within the Department justified its race-conscious decision.

Next, we determine whether the action taken by the City in its effort to remedy past discrimination was narrowly tailored to rectify the specific harm in question. Wessmann, 160 F.3d at 807. We consider several factors in determining whether an affirmative action order was narrowly tailored, including

> the extent to which (i) the beneficiaries of
> the order are specially advantaged; (ii) the
> legitimate expectancies of others are
> frustrated or encumbered; (iii) the order
> interferes with other valid state or local
> policies; and (iv) the order contains (or
> fails to contain) built-in mechanisms which

-20-

> will, if time and events warrant, shrink its
> scope and limit its duration.

Boston Superior Officers, 147 F.3d at 23 (quoting Mackin v. Boston, 969 F.2d 1273, 1278 (1st Cir. 1992)).

The City departed from strict rank order to promote three African-American officers out of thirty-six promotions. The Department would have had to promote twenty African-American officers to create a situation whereby the percentage of African-American officers and African-American sergeants was approximately equal. The necessity for relief was great, but the means chosen by the Department were modest -- only three African-American officers were promoted out of rank -- indicating narrow tailoring. See McNamara, 138 F.3d at 1224 ("The [narrow tailoring] test is . . . whether the increase is a plausible lowerbound estimate of a shortfall in minority representation among [sergeants] that is due to the [Department's] intentional discrimination in the past.").

Only qualified minorities were promoted; they were therefore not "specially," or unfairly advantaged by their promotions. See Boston Superior Officers, 147 F.3d at 24. All officers were competing for a limited number of spots. Because of this competition, the City's promotion of the African-American Officers did not disturb any legitimate, firmly rooted expectations of the appellants. See id.; accord Mackin, 969 F.2d at 1278. Had the City not departed from strict rank order, no additional

-21-

Caucasian officers would have been hired.[9]  See McNamara, 138 F.3d at 1222 (defining narrow tailoring as that which "discriminates against Caucasians as little as possible consistent with effective remediation").

No valid policies have been disturbed by hiring three qualified African-American sergeants.  While Massachusetts law requires an explanation for promotions made outside of strict rank order, there is no prohibition on such out-of-rank decisions.  See Mass. Gen. Laws ch. 31, § 27.

Finally, there were no quotas or long-term guidelines established, and there is nothing in the decision requiring affirmative action in future decisions.  The decision is therefore limited in scope and duration.  We therefore agree with the district court that the City's actions were a narrowly-tailored means of addressing demonstrated past discrimination.[10]

---

[9]  Had the City not considered race in the promotions, only thirty promotions would have been made -- twenty-nine Caucasian officers and one African-American officer.  As a result of the affirmative action plan, those same twenty-nine Caucasian officers were promoted.

[10]  We need not reach the issues of whether avoiding litigation or meeting the operational needs of the Department are compelling state interests.  We are skeptical of the first justification, however: the City's claim that it promoted the African-American Officers in order to avoid litigation rings hollow, as litigation nevertheless ensued.  We are much more sympathetic to the argument that communities place more trust in a diverse police force and that the resulting trust reduces crime rates and improves policing. This operational needs justification has been cited as a compelling state interest by other Circuits.  See Patrolmen's Benevolent Ass'n of N.Y., Inc. v. City of N.Y., 310 F.3d 43, 52 (2d Cir. 2002) ("[A]

## D.  Retained Jurisdiction

At the conclusion of its analysis, the district court sought to eliminate future litigation regarding race-based decisions by the City.  Analogizing to the cy pres doctrine of trusts and estates, whereby parties may petition the court to modify the purpose of a gift because the original purpose has become impractical or impossible, the court retained jurisdiction to review future race-conscious decisions by the City.  The court held:

> Accordingly, this Court will retain jurisdiction post judgment, and directs the City, whenever the Department seeks to use racial factors in hiring or promotion decisions, to formulate its personnel decision and then petition the Court for instructions concerning whether such a racially motivated decision passes constitutional muster. The Department shall so petition this Court both when it "reaches down" to hire or promote a lower scoring individual on the basis of race, and when it picks among candidates who are tied on a civil service exam on the basis of race. On its part, the Court will give notice to all affected parties, including MAMLEO, and promptly will hold a hearing, entertain argument, and render a decision. Done properly, such a procedure ought further predictability, hold down the burgeoning legal

law enforcement body's need to carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves, may constitute a compelling state interest.") (quotation and citation omitted); Reynolds v. City of Chicago, 296 F.3d 524, 530 (7th Cir. 2002); McNamara, 138 F.3d at 1222; Wittmer v. Peters, 87 F.3d 916 (7th Cir. 1996); cf. United States v. Paradise, 480 U.S. 149, 167 n.18 (1987) (not deciding whether operational needs could be a compelling state interest).

> costs of this sort of litigation, and, most important, further the general societal acceptance of the required nuanced balancing.

Cotter, 193 F. Supp. 2d at 356-57.

Whether the district court has the authority to retain jurisdiction is a question of law that we review de novo. See David C. v. Leavitt, 242 F.3d 1206, 1209-10 (10th Cir. 2001). If the court has such discretion, we review its decision for an abuse of discretion. See id. at 1210.

A federal court may exercise ancillary jurisdiction to enforce its judgments. Peacock v. Thomas, 516 U.S. 349, 354 (1996); see also 28 U.S.C. § 1367 ("in any civil action over which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case and controversy."). While a federal court has the power to retain jurisdiction to enforce its decision, the Supreme Court has cautioned against the exercise of ancillary jurisdiction "over proceedings that are entirely new and original." Peacock, 516 U.S. at 358 (internal quotation omitted).

With respect to the district court's attempt to retain jurisdiction over future hiring decisions, neither party addressed hiring at any point in the litigation. The hiring policies of the BPD were not before the court, and it therefore lacks authority to retain jurisdiction over those absent claims. Cf. Rodríguez v.

-24-

Doral Mort. Co., 57 F.3d 1168, 1174 (1st Cir. 1995) ("A federal district court may not, of its own volition, after the parties have rested, recast the complaint and, without notice, predicate its decision on a theory that was neither pleaded nor tried.").

In addition to the standing requirement discussed in Part IIA, supra, Article III's cases and controversies language prohibits federal courts from issuing advisory opinions. Preiser v. Newkirk, 422 U.S. 395, 401 (1975). A court may not "decide questions that cannot affect the rights of litigants in the case" before it. Id. (quotation and citation omitted). The issue of racial preference in hiring by the BPD was never a live, on-going case or controversy in this litigation, and any future decision by the district court regarding hiring would simply be an advisory opinion. The district court therefore lacked subject matter jurisdiction to retain jurisdiction over hiring decisions of the Department.

We further conclude that the retention of jurisdiction over future promotional decisions was an abuse of discretion. "Ancillary enforcement jurisdiction is, at its core, a creature of necessity. When a party has obtained a valid federal judgment, only extraordinary circumstances, if any, can justify ancillary jurisdiction over a subsequent" action. Peacock, 516 U.S. at 359. There are simply no extraordinary circumstances in this case necessitating the retention of jurisdiction.

First, the district court found in favor of the City, and upheld the racially-motivated promotional decision. There was no order by the district court that required enforcement and there is no longer a live issue in this case. Second, this case is not analogous to the situations where the Supreme Court has found continued jurisdiction necessary. Such measures were taken in school desegregation cases, where retention of jurisdiction was necessary because of the continued refusal of school districts to rectify their unconstitutional segregation, and prison reform cases, where continued jurisdiction was necessary because states refused to follow court orders. See Regensburger v. City of Bowling Green, 278 F.3d 588, 598 (6th Cir. 2002) (Batchelder, J., concurring) (finding that a case was not analogous to school desegregation or prison reform cases, and that the district court therefore abused its discretion in retaining jurisdiction); Sierra Club v. Lynn, 502 F.2d 43, 66-67 (5th Cir. 1974) (finding no constitutional basis to support continued exercise of federal judicial power where no analogy could be made to desegregation cases). In the present case, the City has done nothing to violate appellants' constitutional rights, and has never demonstrated unwillingness to comply with a court order. Further, there is no evidence that the City will make future unjustified race-based decisions simply because it has prevailed in this case. The City

has not behaved in such a way that would require ongoing supervision of its decisions.

The district court was frustrated in being faced with a lawsuit challenging affirmative action after what the court perceived as the City's promise, in a prior lawsuit, that it would no longer use affirmative action. See Cotter, 193 F. Supp. 2d at 355. We believe that the district court misreads Boston Superior Officers, which did not include a promise by the City to refrain from race-conscious decisionmaking. Rather, the fact that the Department promoted one sergeant, rather than establishing a quota or some other long-term program, demonstrated that the action was narrowly tailored. Boston Superior Officers, 147 F.3d at 25. Furthermore, we explicitly left open the question of whether the Department could make future race-based decisions. We stated:

> Our conclusion that the BPD was justified in taking race-based remedial action is based strictly on these unique circumstances, and does not give the BPD a license to depart from strict rank order in future promotions. Whether any similar factors are left that might warrant future remedial action is a question that we need not now address . . . .

Id. (emphasis added). So long as the City's actions are constitutional (as the promotion of the African-American Officers was in this case), the City is permitted to consider race in its decisions.

We have no doubt that a lawsuit will be filed should appellants or anyone else believe that a future racially-motivated

-27-

decision of the Department violates their constitutional rights. Subject to the standing requirements discussed above, this will create an actual case or controversy for the federal courts to adjudicate. Until that time, the court lacks the power and necessity to decide constitutional issues regarding the City's promotional decisions.

In short, the district court lacked the subject matter jurisdiction to retain jurisdiction over future hiring decisions, and lacked the necessity required to retain jurisdiction over future promotional decisions. We therefore vacate the district court's retention of jurisdiction over future race-based decisions of the Department. "This solution relegates the federal judiciary to its proper limited position, allows the legislative branch full sway within constitutional boundaries, and prevents continuing friction between the federal judiciary and a state entity." Regensburger, 278 F.3d at 598-99 (Batchelder, J., concurring).

### III. Conclusion

"The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." Adarand, 515 U.S. at 237. The City has sought to remedy its past discrimination within the Department through the selective promotion of three African-American officers. The City's action was constitutional. There is

no reason for the district court to retain sweeping jurisdiction over all hiring and promotional race-conscious decisions of the Department.

We therefore affirm the district court's decision that the City's actions did not violate appellants' constitutional rights and reverse the district court's retention of jurisdiction.

**<u>Affirmed in part and reversed in part</u>**.