**Lee YEAGER, et al., Plaintiffs–Appellants,**

v.

**GENERAL MOTORS CORPORATION, Defendant–Appellee.**

No. 01–4343.

United States Court of Appeals, Sixth Circuit.

June 11, 2003.

BEFORE: GUY, BOGGS, and DAUGHTREY, Circuit Judges.

PER CURIAM.

The plaintiffs, Lee Yeager and David Polonus, brought this suit against General Motors Corp., alleging that the failure to hire them into apprenticeship programs at two GMC plants was due to discriminatory employment practices, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. Yeager had earlier brought a similar suit against GMC, *Yeager v. General Motors Corp.*, 265 F.3d 389 (6th Cir.2001) (*Yeager I*), challenging the company's affirmative action program at the Lordstown Assembly plant. In this case, Polonus challenges the same selection process at the Lordstown Assembly plant, and both Polonus and Yeager challenge a substantially similar process at GMC's Packard plant.

In *Yeager I*, we affirmed the district court's grant of summary judgment for

GMC on Yeager's claims, on the grounds that he did not have Article III standing to bring the claims, having suffered no injury as a result of the affirmative action program at issue there, and because he had not established a prima facie case of race discrimination.

Here, the district court granted GMC's motion for summary judgment on the same alternate grounds that formed the basis for our opinion in *Yeager I:* (1) that plaintiffs lacked standing to challenge hiring procedures that had no effect on their failure to obtain employment with GMC; and (2) that plaintiffs could not establish a prima facie case of race discrimination because they cannot establish that GMC is that unusual employer that discriminates against the majority. We affirm.

## *PROCEDURAL AND FACTUAL BACKGROUND*

In this case, Yeager and Polonus allege that GMC discriminated against them by failing to hire them into the program at the Packard Electric plant in Warren, Ohio, in 1995, and Polonus alleges that GMC discriminated against him by failing to hire him into the program at the Lordstown Assembly plant in 1996.

In *Yeager I,* we gave the following description of the application process for the company's apprentice program:

> GMC recruits applicants into its skilled trade positions (e.g., Truck Repair, Tool Making) through its apprentice training program.... GMC administers its apprentice program in compliance with its collective bargaining agreement with the International Union UAW....
>
> GMC seeks apprentice applicants by publishing notices with information about the program and the application process. White males interested in the apprentice program must submit applications. GMC accepts a limited number of applications each hiring period on a first-come, first-serve basis. GMC sends completed applications to an independent firm that randomly selects a specified number of applicants who are then permitted to take a written examination. In addition, GMC seeks qualified minority and female applicants to the apprentice program through its contacts with local minority and female employment organizations. Each applicant lists the top three skilled trades for which they want to be considered.
>
> White male applicants that are randomly selected take a written exam that evaluates their general abilities in areas such as mathematics and reading comprehension. Recruited minority applicants and female applicants are permitted to take the written examination without being randomly selected. If an applicant has previously taken an exam at another GMC plant, and is randomly selected, the applicant may have their previous test score transferred.
>
> Applicants are ranked by their written exam score. The top thirty percent of minority applicants, female applicants, and white male applicants are interviewed. Applicants receive another score for their interview performance.
>
> Applicants receive an overall ranking for each skilled trade based on the sum of their written test and interview scores. The highest possible score is seventy-two. Apprenticeship selections are based solely on the applicants' total scores.
>
> GMC keeps separate lists for seniority applicants and nonseniority applicants pursuant to the terms of its collective bargaining agreement with the UAW. Thus, for every two seniority applicants offered apprenticeships, only one nonseniority applicant may be offered an apprenticeship.

Applicants' ranked positions on the seniority and nonseniority lists may change in the following three ways: (1) as new applicants are tested and added to the list; (2) as applicants are selected for apprenticeships and taken off the list; and (3) when applicants are allowed to retest and the overall rankings are readjusted. The initial overall rankings for each skilled trade are generated without regard to race or sex. However, minority and female applicants may attempt to increase their total scores by participating in GMC's Pre–Apprentice Training Program ... and the overall rankings are adjusted accordingly.

GMC conducts a training program for minority and female applicants whose scores are near the selection range. The training program provides additional training to minority and female apprentice program candidates. Following their training, minority and female applicants may take a written test that may improve their total score by up to seven points. However, the training program participants may not receive a total score exceeding the maximum possible score of seventy-two. The training program's participants' test points are added to their total scores, and the overall rankings are adjusted accordingly. Yeager is a nonseniority white male. He applied to the apprentice program at GMC's Lordstown Assembly Plant in 1989. He took his first written exam in 1989 and was interviewed in 1990 for his selected three positions (Truck Repair, Tool Making, and Pipefitting). He attained his highest score, fifty-three, in Truck Repair. In 1991, four seniority positions and one nonseniority position in Truck Repair became available. The nonseniority position was filled by a white male with a score of sixty-eight, fifteen points higher than Yeager's score. In 1993, a new apprentice class was selected, but only two seniority and

no nonseniority positions opened in Truck Repair.

In 1996, Yeager exercised his option to retake the written exam and changed his Truck Repair preference to Millwright. After his interviews, Yeager achieved a total score of sixty in Millwright, fifty-seven in Tool Making, and fifty-five in Pipefitting. Later that year, GMC selected apprentices for its Assembly Plant. Thirteen seniority and six nonseniority Millwright apprenticeships became available. Six seniority and three nonseniority Pipefitting apprenticeships became available. Yeager's total score placed him fourteenth among the nonseniority white males for Millwright, twenty-fourth for Pipefitting, and thirty-sixth for Tool Making. The top fifty candidates· for the apprentice positions were all white males and Yeager was not among them. After the training program points were factored into the overall rankings, thirty-eight white males were accepted into the apprenticeship program. Women and minorities who had scores lower than Yeager's before they participated in the training program were selected for the apprenticeship program.

In 1997, Yeager applied to the apprentice program at GMC's Lordstown Fabrication Plant. The Fabrication Plant is a separate facility from the Assembly Plant and it has its own, separate, apprentice program. Applicants with a previous score at another GMC facility may have their total score applied to the Fabrication Plant apprentice program but they must first go through the random selection process. Yeager was not randomly selected for the nonseniority applicant list and, therefore, his scores were not transferred.

*Yeager I*, 265 F.3d 389, 392–94.

The district court found in this case that *Yeager I* was controlling as to Polonus's

claim regarding the Lordstown Assembly plant, pointing to our holding that Yeager had no standing because his final raw score was not within the top 50 white males. It followed, the district court held, that there was no causal connection between GMC's affirmative action programs and its failure to accept Yeager into the apprenticeship program. The court held that Polonus had likewise failed to demonstrate that he was injured by the affirmative action programs, because his raw score was also not within the top 50 white males on the consideration list.

In addition, the district court found that the plaintiffs did not have standing regarding the Packard plant claims. Neither Yeager nor Polonus had been selected in the random drawing that determined which candidates were interviewed. However, even if they had been selected by the drawing, and assuming that each achieved the highest possible interview score, neither would have ranked high enough to be selected for the apprenticeship programs even if none of the practices challenged by the plaintiffs had been in place. That is, both were outranked by more white men than there were total spaces in the apprenticeship programs.

Finally, the district court found that the mere fact that GMC administers affirmative action programs does not constitute direct proof of intentional discrimination against the majority sufficient to make out a case of race discrimination.

## DISCUSSION

To establish Article III standing, a plaintiff must "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *County of Riverside v. McLaughlin*, 500 U.S. 44, 51, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (citation omitted). Three essential elements must be proven for a plaintiff to satisfy standing requirements: (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). Moreover, when a white male is alleging "reverse" discrimination, he must prove that "but for the [affirmative action] program, he would have been considered for the job." *Yeager I*, 265 F.3d at 395.

In order to avoid the same outcome as in *Yeager I*, the plaintiffs in this case offer a "denial of equal access" argument in which they assert that they may make a Title VII claim because, had they been minorities or women, they could have been admitted to the apprenticeship programs based on their raw scores. However, this argument ignores the fact that, in order to gain admission to the apprentice program, Polonus and Yeager would have had to benefit from the minority program, while all other white males did not. In other words, Yeager and Polonus would not have been hired *unless* they were given preference over more highly qualified white men. This scenario cannot provide the requisite "injury in fact" for a Title VII claim because it fails the "but for" test: "but for" GMC's affirmative action measures, Polonus and Yeager would still not have been selected for the programs at issue. The instant case, then, presents the same claim at issue in *Yeager I*, despite plaintiffs' attempts to rearticulate the claim in a different form.

Nor do we believe that this case can otherwise be distinguished from *Yeager I*. The plaintiffs argue that Yeager sought injunctive relief in the prior case, in addition to retrospective damages, while in the instant case Yeager and Polonus sought

only retrospective relief in the form of damages. This distinction has no impact on Article III standing. The plaintiffs still must show that they suffered an "injury in fact" in order to bring a claim under Title VII.

Given the plaintiffs' failure to establish standing, we find it unnecessary to address the district court's alternative basis for dismissal. We specifically decline to address the district court's ruling on equitable tolling of the applicable statute of limitations.

## CONCLUSION

Having had the benefit of oral argument, and having studied the record on appeal and the briefs of the parties, we are not persuaded that the district court erred in dismissing the complaint for lack of standing. Because the reasons why judgment should be entered for the defendant have been fully articulated by the district court, the issuance of a more detailed opinion by this court would be duplicative and would serve no useful purpose. Accordingly, we AFFIRM the judgment of the district court for the reasons noted above and based upon the reasoning set out by the district court in its memorandum opinion dated December 17, 2001.